Jean RUSSELL, Plaintiff,

v.

Jack HATHAWAY et al., Defendants.

Civ. A. No. CA 7–76–29.

United States District Court,
N. D. Texas,
Wichita Falls Division.

Dec. 10, 1976.

John D. Copeland, Short & Copeland, Wichita Falls, Tex., for plaintiff.

Clyde Fillmore, Fillmore, Lambert, Farabee, Purtle & Lee, Wichita Falls, Tex., for defendant trustees.

Elizabeth Levatino and David M. Kendall on behalf of John Hill, Atty. Gen. of Texas and Mark White, Secretary of State, State of Texas, Austin, Tex., for defendants.

Before GOLDBERG, Circuit Judge, and HIGGINBOTHAM and HILL, District Judges.

## OPINION

HIGGINBOTHAM, District Judge.

This is an attack upon Texas' durational residence requirement for seeking political office. The attack must fail. Plaintiff Jean Russell moved to Wichita Falls in June of 1975 and on January 19, 1976, registered to vote. In February, she filed as a candidate for the position of Trustee of the City View Independent School District. On April 3, 1976, an election for three vacancies was held with the following result:

| | |
|---|---|
| Rosemary Barrett | 376 |
| Jean Russell | 369 |
| O. A. Griest | 366 |
| Archie Johnston | 335 |
| Jack Francisco | 315 |
| Clarence Shook | 312 |

Although initially declared to be one of three winners, on April 5, 1976, Jean Russell was declared ineligible for election for failure to meet the one year residency requirement of the Texas Election Code.[1] No new election was held; instead the next candidate in number of votes received was declared the winner. This suit against the members of the school board followed. Because Jean Russell, by seeking appropriate declaratory and injunctive relief against state officers raised substantial questions as to the constitutionality of the one year residence requirement, a statute of state-wide application, this three-judge court was convened. The case was argued upon stipulated facts.

Jean Russell urges that Texas' requirement that a candidate for public office be a state resident for one year classifies candidates contrary to the Equal Protection clause of the constitution. She argues that the residency statute uses a "suspect" criterion for classification, namely those candidates that have traveled within one year, and finally that the statute entrenches upon fundamental rights of travel, voting and candidacy.

The school board denies that any "suspect" criterion or "fundamental" interest is impinged; that regardless, the statute meets even the strict scrutiny of a compelling necessity test.

These facts not only pose equal protection questions as to the present constitutional tolerance of state denials to recently traveled residents of the opportunity to run for public office but also raise questions as to the measuring standards for equal protection review.

While this case was sub judice the Fifth Circuit in *Woodward v. City of Deerfield Beach*, 538 F.2d 1081 (5th Cir. 1976), declined to strike down a municipal requirement that a candidate for the office of City Commissioner be a city resident for the six months preceding the election. While the requirement apparently gave the Court

---

1. "No person shall be eligible to be a candidate for, or to be elected or appointed to, any public elective office in this state unless . . . he will have resided in this state for a period of 12 months next preceding the applicable date specified below, and for any public office which is less than statewide, shall have resided for six months next preceding such date in the district, county, precinct, municipality or other political subdivision for which the office is to be filled . . . ." V.A.T.S., Election Code, Art. 1.05.

some pause, the Court believing the issue to have been foreclosed both by the existence of residence requirements in the constitution itself and by the Supreme Court's summary affirmance of *Chimento v. Stark*, 353 F.Supp. 1211 (D.N.H.1973), aff'd mem. 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973), and *Sununu v. Stark*, 383 F.Supp. 1287 (D.N.H.1974) aff'd mem. 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975), did not engage in an extended analysis of the constitutional issues presented. *See also Hadnott v. Amos*, 320 F.Supp. 107 (M.D.Ala. 1970) aff'd mem. 401 U.S. 968, 91 S.Ct. 1189, 28 L.Ed.2d 318 (1971) sustaining Alabama's one year residency in a circuit as a requirement of appointment or election as a Circuit Judge.

■ A three-judge court is bound by apposite decisions of the Court of Appeals for its circuit. The addition by Congress in the three-judge court acts of a second district judge and a Circuit Judge together with direct appeal to the Supreme Court was not a grant of authority with elevated precedential stature but a withdrawal of power from a single judge. *Kennedy v. Mendosa-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). As stated by one district judge ". . . however constituted, the [three-judge] court . . . was only the District Court for the Federal Judicial District of Nebraska." *Remick Music Corp. v. Hotel Corp. of Nebraska*, 58 F.Supp. 523 (D.Neb.1944), aff'd 157 F.2d 744 (8th Cir. 1946). See also, *Farley v. Farley*, 481 F.2d 1009 (3rd Cir. 1973). Contra *Jehovah's Witnesses in the State of Washington v. King County Hospital*, 278 F.Supp. 488 (W.D.Wash.1967) aff'd mem., other grounds 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968).

Regardless of the binding grasp of Circuit decisions upon three-judge courts, this court accedes to their precedential force. To do otherwise would create potential intra-circuit conflict with no meaningful mechanism for its resolution within the Circuit. Thus we are bound by decisions of the United States Court of Appeals for the Fifth Circuit.

Residency requirements sustained to date have applied equally to all candidates in the sense that all candidates who reside in the geographical limits of the office's constituency were eligible. Moreover *Sununu v. Stark*, 383 F.Supp. 1287 (D.N.H.1974), held that a state may properly require that a candidate for local office be a resident of the state with no requirement of residence within the office's constituency. In *Sununu* New Hampshire's seven-year residence requirement for the office of State Senator was upheld. There was no requirement that the candidate reside in his senatorial district for a prescribed period.

■ Thus under *Chimento* and *Sununu*, a state may seek the goals of informed voters and informed candidates by imposing requirements that the candidate reside for prescribed periods in the state or within the geographical confines of his office's constituency. Because we do not see a meaningful distinction between an attempt to achieve these ends or objectives by both means, residency within the constituent area with an additional period of residency within the state, and an attempt to do so separately, this case is controlled by *City of Deerfield, Sununu* and *Chimento*.

This acquiescence in result should not be taken as acquiescence in method which we fear may be fraught with hazards. The Supreme Court's view of summary affirmance in turn led the court in *City of Deerfield* to deal in summary fashion with the current troubled standards of equal protection review.

### Summary Affirmance

*City of Deerfield* did not attempt to analyze the equal protection question (although the opinion conceded that ". . . durational residency requirements cannot be easily dismissed", 538 F.2d, at 1083) because:

". . . of the inclusion of residency requirements in the Constitution and the recent Supreme Court decision upholding the constitutionality of a seven-year durational residence requirement for the of-

fice of state senator . . ." Id. at 1084.[2]

*Deerfield* unqualifiedly characterized the Supreme Court's summary action as a decision of the Supreme Court and conceded its binding force. At least the latter is apparently mandated by *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). ["(T)he lower courts are bound by summary dispositions by this Court . . . ." Id. at 344–5, 95 S.Ct. at 2289.][3]

The *Hicks* decision leads lower courts to give higher status to summary affirmance by the Supreme Court than does the Supreme Court, that court being of the view that ". . . they are not of the same precedential value as would be an opinion of this Court treating the question on the merits." *Edelman v. Jordan,* 415 U.S. 651, 671, 94 S.Ct. 1347, 1359, 39 L.Ed.2d 662 (1974).

■ We need not decide here the force of summary dispositions, because we are bound by the Court of Appeals' *City of Deerfield* decision with its acceptance of *Chimento* and *Sununu's* applicability. Therefore, we must allow the Texas statute to stand. We are bound regardless of the legal sufficiency of the compulsion underlying *City of Deerfield,* a question with few clear answers.

One value of discretionary review is its grant of power to the Supreme Court to allow the lower courts to distill workable principles in difficult areas. Indeed conflict

among the circuits is often not only not a cause for alarm but is a manifestation of this distilling process at work. Summary affirmance only stunts that process. Although ultimate responsibility for compelled review by the Supreme Court must be laid in a causal sense, with the Congress, the scope and reach of such review is determined in great measure by the Supreme Court itself. The reduction in the number of three-judge courts now required will mitigate but not solve the problem.[4] This case is illustrative of the stunting effect of the Supreme Court's present view of summary affirmances.[5] Such summary disposition is peculiarly inappropriate in this specie of constitutional adjudication tending, as it does, to deprive the Supreme Court of the distilling efforts of the lower courts. Nor is this loss offset by any identifiable benefit. The quest for "certainty" in the law here is at best illusory, nor is it a meaningful means of resolving any conflicts in the circuits. Apart from the fact that the Supreme Court cannot time its review, the ratio decidendi of the case is lost in the opinion of the court below and the appellate papers of the litigants.

### Equal Protection Standards

Through *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), the analysis of equal protection issues was caught in a seeming lock-step decisional process produced by the "strict scrutiny" and "traditionalist tests". Whether individ-

---

**2.** The seven-year residence requirement referred to was in *Sununu v. Stark,* 383 F.Supp. 1287 (D.N.H.1974), aff'd mem. 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975).

**3.** This view, however, travels in a different direction from Judge Wisdom's observation in *Brown v. Liberty Loan Corp. of Duval,* 539 F.2d 1355 (5th Cir. 1975).

"The appellant also urges that the Supreme Court's summary affirmance in *Moya v. De-Baca,* 1969, 395 U.S. 825, 89 S.Ct. 2136, 23 L.Ed.2d 740, aff'g, D.N.M.1968, 286 F.Supp. 606, requires reversal of the district court's holding in this case. Although the *Moya* issue is virtually identical to the one we face here, summary affirmances by the Supreme Court may not create binding precedents. . . ." Id. 1363 n.5.

**4.** The same issues would still be presented by a dismissal of an appeal by the Supreme Court for "want of a substantial federal question." *See Howell v. Jones,* 516 F.2d 53 (5th Cir. 1975).

**5.** *See Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). *See also, Eaton v. Price,* 360 U.S. 246, 247, 79 S.Ct. 978, 3 L.Ed.2d 1200; *Colorado Springs Amusements, Ltd. v. Rizzo,* 524 F.2d 571, cert. den. —— U.S. ——, 96 S.Ct. 3228, 49 L.Ed.2d 1222 (1976). *But see* J. Brennan, dissenting: "There is reason for concern that Hicks will impair this court's ability—indeed responsibility—to adjudicate important constitutional issues". Id. at 3229.

uals disadvantaged by a state classification were injured by a permissible state act, or a state act suffering from infirmities of constitutional proportion turned first (and usually last) upon the measuring standard selected. There were two. The first, often termed the "traditional test" is whether:

".  .  .  the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if a state of facts reasonably may be conceived to justify it. *McGowan v. Maryland,* 366 U.S. 420, 425, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961).

The second test of state classification is frequently termed the "compelling state interest" standard or the "close scrutiny review." In essence it is opposite from the inquiry of whether the ".  .  .  Court can conceive of a 'rational basis' for the distinctions made." *Kramer v. Union Free School District,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583. *See Developments in the Law-Equal Protection,* 82 Harv.L.Rev. 1065 (1969).

A litigant on the downhill side of these "standards" was faced with a difficult task. Understandably, when equal protection was at issue, the issue was in fact joined over these ostensibly preliminary procedural points. However, they are akin to determinants, not guide posts.

In general, the strict test is applicable: ".  .  .  when a fundamental interest is impaired *or* a suspect distinction drawn.  .  .  ." *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965); *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) [Emphasis added].

How a right achieves fundamental status is yet to be fully articulated. *See* dissent of J. Rehnquist in *Weber v. Aetna Casualty & Surety Co.,* 406 U.S. 164, 177, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) and J. Marshall in *Dandridge v. Williams,* 397 U.S. 471, 520–521, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). *But see* opinion of J. Powell in *San Antonio School District v. Rodriquez,* 411 U.S. 1, at 29, 40, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

Thus, when a fundamental interest was "impaired", such as voting, *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), *or* a suspect distinction was drawn, such as race, *Korematsu v. United States,* 323 U.S. 214, 216, 65 S.Ct. 193, 89 L.Ed. 194 (1944) the strict test was applicable. Otherwise, the "traditional test" was used.

Because the "preliminary" determination of suspect criterion and fundamental interest so effectively compels the outcome, the use of these litmuses in the exercise of the power of judicial review creates a high risk of presenting *ipse dixit* results without the undergirding of judicial reasoning and persuasion. This weakness in methodology has not gone unnoticed and the strict scrutiny language of compelling necessity may be shifting. *See e. g., Bullock v. Carter,* 405 U.S. 134, 144, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972), *Dunn v. Blumstein,* 405 U.S. 330, 336–337, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), where the standard used was "reasonably" necessary to the accomplishment of legislative state objections.

Not surprisingly, this shift in language has provoked considerable academic discussion. *See* Gunther, *In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection,* 86 Harv.L.Rev. 1 (1972). This is no mere academic exercise in semantics. Articulation of at least ostensibly objective standards for judicial review of legislation may now be of equal, if not more, importance than the discrete result of a durational residency case. That is not to place process and method over result. It is to give to method greater attention than it has recently received, at least where choices of "method" are themselves decisions as to the constitutionally proper orbits of the coordinate branches of government. *See* Judge Johnson's dissent· in *Hadnott v. Amos,* 320 F.Supp. 107 (M.D.Ala.1976).

It is doubtful that the Texas statute could pass a test of strict scrutiny; it is

equally doubtful that it would fail a rational purpose test, at least where that test tolerated any judicially hypothesized purpose.

Arguably, candidacy is so intertwined with voting that an entrenchment of candidacy equally impacts voting; that state intrusions into candidacy should have no more range than similar intrusions into voting; that a residency requirement can amount to a penalty for the exercise of a constitutionally protected right of travel. But it is not (at least ought not to be) necessary to choose between the Scylla of adding to the list of fundamental interests[6] and the Charybdis of the traditionalist standard of review. Indisputably, the State of Texas has intruded into a constitutionally sensitive area, laced with the penumbrae of protected associational conduct as voting, travel and the mechanistic heart of government, candidacy. The judiciary ought to give notice that the area, is in fact, sensitive. Though a fundamental interest is not directly hit and a wholly suspect criterion is not used, state intrusions into this milieu ought to be measured by objective and exacting standards. Whether that standard be an inquiry into the means chosen to achieve the ends, with implicit review of less intrusive legislative alternatives, or relationship between presumption and fact, these cases ought not be dispatched in successive waves of summary affirmances, with little examination of underlying principles.[7] This standard will not be achieved by epigrammatic formulation but by the accretion-like by-product of case by case analysis.

In sum, while we are bound by the result in *City of Deerfield, Sununu* and *Chimento*,

we believe with all deference that the opinion in *City of Deerfield*, virtually compelled by the Supreme Court's view of summary affirmance, demonstrates the force of Justice Brennan's dissent from the denial of certiorari in *Colorado Springs Amusements, Ltd. v. Rizzo*, —— U.S. ——, 96 S.Ct. 3228, 49 L.Ed.2d 1222 (1976). The result is a by-passing of more steely inquiries by lower courts engaged in the supportive role of distillation, a process better calculated to evolve a meaningful standard which reaches results with reason, not by categorization.

The parties will submit a proposed form of judgment consistent with this opinion.

---

**6.** Inherent in this lock-step methodology is that categorizing interests as fundamental or criterion as suspect inevitably requires either illogical and gossamer thin distinctions or results originally unforeseen and when seen in the stress of later cases, unintended; a classic example of "The Tyranny of Tags and Tickets", Cardozo, *Mr. Justice Holmes*, 44 Harv.L.Rev. 682, 688 (1931). One could argue from the cases that whatever led to the royalty status of fundamental interest and suspect criterion, the palace gate is now closed and no more will be recog-

nized. Such a circumstance is almost predictable given the rigidity of this analytical approach.

**7.** Nor should the courts overlook examination of the controlling force of a summary affirmance. As the Supreme Court itself noted: ". . . ascertaining the reach and content of summary actions may itself present issues of real substance, . . ." *Hicks v. Miranda*, 422 U.S. at 345 n. 14, 95 S.Ct. at 2290.