Raymond Frank JOSEPH, Plaintiff,

v.

CITY OF BIRMINGHAM, a Michigan Municipal Corporation, Phyllis Armour, City Clerk for the City of Birmingham, Jeofrey Hockman, Donald Jensen, Barbara Jeske, Jack Sights, William York, Gary Kain, and Jack Sights, Election Commissioners for the City of Birmingham, Jointly and Severally, Defendants.

Civ. A. No. 81–70419.

United States District Court, E. D. Michigan, S. D.

March 11, 1981.

Gregory Fisher Lord, Detroit, Mich., for plaintiff.

Dean G. Beier, Bloomfield Hills, Mich., for defendants.

## MEMORANDUM OPINION AND ORDER CONCERNING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

PHILIP PRATT, District Judge.

This lawsuit involves a challenge to the constitutionality of certain provisions of the city charter of the City of Birmingham, Michigan. These provisions disqualify any person from becoming a candidate for the office of city commissioner unless that person has been a city resident for at least one year immediately prior to the general election. Plaintiff aspires to run for the office of city commissioner in the upcoming election on April 6, 1981. Although he is apparently qualified in all other respects, he concedes that he cannot meet the one year residency requirement.

Plaintiff has filed a motion for a preliminary injunction to restrain the defendant city officials from enforcing the city charter's one year residency requirement, and to compel the defendants to place plaintiff's name on the ballot for the April 6th election.

Broadly stated, plaintiff's theory is that the city charter provision violates the equal protection clause of the Fourteenth Amendment because the charter provision discriminates against newly-arrived residents. According to plaintiff, such differential treatment is impermissible in that it trenches upon fundamental rights of interstate travel, voting, and political activity.

Although they can be simply stated, the issues in this case are enormously difficult. In the first place, there is an agonizing split of case authority—the tug of precedent in this Circuit pulls one way, but more recent developments in other courts pull the opposite way. In addition to the equivocal direction of the decisions in this area, the Court must face intrinsically complex questions of legal doctrine. And, assuming these conceptual problems are resolved, there remains the arduous task of applica-

tion and the reconciliation or balancing of competing interests.

Deciding this motion is made more difficult by the press of time. Oral arguments were heard on March 2nd. The Court was then informed that the election ballots will be sent to the printer on March 10th. The Court has attempted to decide this matter as expeditiously as possible with due regard for the complexity and substantiality of the issues.

The Court will organize the discussion by first stating plaintiff's arguments in favor of striking the residency requirements, then examining defendants' arguments for upholding the requirement, and finally suggesting three alternative approaches to resolve this controversy.

## I. THE ARGUMENT FOR INVALIDATING THE DURATIONAL RESIDENCY REQUIREMENT

Briefly put, plaintiff's argument is that the law of the Sixth Circuit clearly compels this Court to employ the most demanding sort of strict scrutiny in reviewing the city charter provision at issue here. In fact, every one of the decisions in this Circuit that has considered a durational residency requirement for candidates has held the requirement unconstitutional. On plaintiff's view, the logical thrust of these cases dictates that the Court strike the city's one year residency provision.

### A. *The Appropriate Standard of Review*

Generally, when deciding whether a law violates the equal protection clause, the courts consider three elements:

"The character of the classification in question; the individual interests affected by the classification; and the governmental interests asserted in support of the classification." *Dunn v. Blumstein,* 405 U.S. 330, 335, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972).

Customarily the courts have not engaged in *ad hoc* balancing of these elements. Instead a categorical approach has evolved: equal protection cases have been divided into two categories and a specific standard of review has been formulated for each. *See generally,* Gunther, "Forward: In Search of Evolving Doctrine on a Changing Court—A Model for a Newer Equal Protection", 86 Harv.L.Rev. 1 (1972); "Developments in the Law—Equal Protection", 82 Harv.L.Rev. 1065 (1969).

First, in the ordinary equal protection case, the courts will uphold the challenged law as long as it has some rational basis, or as long as it is reasonably related to a legitimate governmental concern. *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961). This minimal level of scrutiny reflects the courts' traditional deference to legislative acts in equal protection cases.

A second standard of review comes into play, however, when the challenged law creates or recognizes a suspect classification (such as race) or impinges upon a fundamental constitutional right (such as freedom of speech). In such circumstances, the legislative act will be subjected to heightened scrutiny: the law will be invalidated unless it is "necessary to promote a *compelling* governmental interest." *Shapiro v. Thompson,* 394 U.S. 618, 634, 89 S.Ct. 1322, 1331, 22 L.Ed.2d 600 (1968). In this second category of cases, it is not enough that the challenged law meets the traditional test of reasonableness:

"Statutes affecting constitutional rights must be drawn with 'precision', *NAACP v. Button,* 371 U.S. 415, 438 [83 S.Ct. 328, 340, 9 L.Ed.2d 405] (1963); *United States v. Robel,* 389 U.S. 258, 265 [88 S.Ct. 419, 424, 19 L.Ed.2d 508] (1967), and must be 'tailored' to serve their legitimate objectives. *Shapiro v. Thompson, supra* [394 U.S.], at 631 [89 S.Ct. at 1329]. And if there are other, reasonable ways to achieve those goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference. If it acts at all, it must choose 'less drastic means.' *Shelton v. Tucker,* 364 U.S. 479, 488 [81 S.Ct. 247, 252, 5 L.Ed.2d 231] (1960)." *Dunn v. Blumstein, supra* 415 U.S. at 343, 92 S.Ct. at 1003.

This second tier of equal protection analysis, developed by the Supreme Court under

the stewardship of Chief Justice Warren, has allowed for more frequent invalidation of legislative enactments within the class of laws designated for strict scrutiny. Gunther, *supra* at page 8. Indeed, the second level of review has been called "'strict' in theory and fatal in fact"; the court's initial decision regarding the appropriate standard of review is virtually determinative of the outcome.[1] Gunther, *supra*. Thus the critical inquiry concerns the presence of a fundamental right or a suspect classification which would trigger strict scrutiny.

The Supreme Court has not yet addressed the question of the appropriate standard of review for cases involving durational residency requirements for candidates. 65 A.L.R.3d 1048 "Validity of Requirement That Candidate or Public Officer Have Been Resident of Government Unit for a Specified Period" § 5. Yet many federal and state courts have decided this question in contexts similar to that at bar. The substantial majority of these courts, and apparently all the courts in this Circuit which have faced the question, have held that strict scrutiny must be applied to durational residency requirements for candidates. *Id.* (collecting cases). *Howlett v. Salish and Kootenai Tribes*, 529 F.2d 233, 242–243 (9th

Cir. 1976); *Alexander v. Kammer*, 363 F.Supp. 324, 326 (E.D.Mich.1973).[2]

There is some disagreement among these cases regarding the basis for invoking the more rigorous standard of review. Some hold that candidate durational residency requirements implicate the fundamental right of interstate travel. *E. g., Green v. McKeon*, 468 F.2d 883 (6th Cir. 1972); *Headlee v. Franklin .Co. Bd. of Elections*, 368 F.Supp. 999 (three judge court Ohio 1973); *Thompson v. Mellon*, 507 P.2d 628 (S.C.Cal.1973).[3] Other cases declare that strict scrutiny is justified because the fundamental right to vote is impaired by candidate residency qualifying periods. *Wellford v. Battaglia, supra; Mogk v. City of Detroit*, 335 F.Supp. 698 (three judge court E.D.Mich.1971); *Bolanowski v. Raich*, 330 F.Supp. 724 (E.D.Mich.1971).[4] Finally, some cases find strict scrutiny triggered by the fundamental rights of political expression and association, *Headlee* and *Mogk, supra*, or by the conceived distinct right to be a candidate for public office, *Thompson, supra*, and *Cowan v. Aspen*, 181 Colo. 343, 509 P.2d 1269 (1973).[5] Despite these varying opinions as to the constitutional grounds for applying strict scrutiny, the

---

**1.** *See* Section III B1 *infra*.

**2.** *See also, Brill v. Carter*, 455 F.Supp. 172 (D.Md.1978) and *Matthews v. Atlantic City*, 84 N.J. 153, 417 A.2d 1011 (1980) (both collecting cases). It appears that only three federal circuit courts of appeals have taken a position on this matter—all three have held that strict scrutiny applies. *Green v. McKeon*, 468 F.2d 883 (6th Cir. 1972); *Wellford v. Battaglia*, 485 F.2d 1151 (3rd Cir. 1973); *Howlett v. Salish and Kootenai Tribes, supra* (9th Cir.). (The Fifth Circuit did not discuss the standard of review when it upheld a six month residency requirement for city commissioners in *Woodward v. City of Deerfield Beach*, 538 F.2d 1081 (1976)). These other cases arising in the Sixth Circuit have ruled that strict scrutiny must be used in situations like the one at bar: *Headlee v. Franklin Co. Bd. of Elections*, 368 F.Supp. 999 (three judge court Ohio 1973); *Mogk v. City of Detroit*, 335 F.Supp. 698 (three judge court E.D.Mich.1971); *Alexander v. Kammer, supra; Bolanowski v. Raich*, 330 F.Supp. 724 (E.D.Mich.1971). *Accord, Grano v. Ortisi*, 86 Mich.App. 482, 272 N.W.2d 693 (1978).

But see, for example, *Russell v. Hathaway*, 423 F.Supp. 833 (three judge court N.D. Texas

1976) and *Daves v. City of Longwood*, 423 F.Supp. 503 (M.D.Fla.1976) (both holding that the mere rationality test is appropriate in these circumstances). *See also* the discussion at Section III A of this Opinion.

**3.** But see, for example, the following cases finding no infringement of the right of interstate travel (and concluding that the rational basis test should be used): *Matthews v. Atlantic City*, 84 N.J. 153, 417 A.2d 1011 (1976); *Russell v. Hathaway*, 423 F.Supp. 833 (three judge court N.D. Texas 1976); *Walker v. Yucht*, 352 F.Supp. 85 (three judge court Del. 1972); `Draper v. Phelps`, 351 F.Supp. 677 (Okl. 1972). *See also* the discussion in Section III A of this Opinion.

**4.** But see the *Matthews* and *Walker* cases cited in footnote 3 *supra*, as well as the Daves cases cited in footnote 2 *supra* (finding no abridgement of fundamental voting rights). See further discussion of the right to vote at Section III A1 of this Opinion.

**5.** *See* footnote 4 *supra*.

majority of courts have employed the strict scrutiny test in a rigorous manner and have found residency requirements invalid.

### B. *The Law of the Sixth Circuit*

The leading cases from the Sixth Circuit illustrate these patterns. Of major importance is the Sixth Circuit's decision in *Green v. McKeon, supra.* There the Court of Appeals, in a two-to-one decision, struck down a provision of the Plymouth, Michigan, city charter requiring two years residency for city commissioner candidates. The Court of Appeals held that close scrutiny was required because the law infringed the fundamental right of interstate travel. 468 F.2d at 884. The Court of Appeals discussed the primary justification urged in support of the residency period—the need for candidates to become familiar with the local government and the problems of the community:

> "The restriction is in no way 'tailored' to achieve the stated municipal goal. It permits a two year resident of Plymouth to hold public office regardless of his lack of knowledge of the governmental problems of the city. On the other hand, it excludes more recent arrivals who have had experience in local government elsewhere or who have made diligent efforts to become well acquainted with the municipality. Further, in our representative form of government, the voters are the arbiters of the suitability of candidates for public office. Whether a candidate has the ability to carry out the duties of a particular city office, even though he arrived in Plymouth less than two years prior to election day, is a matter for consideration by the voters in choosing between candidates running for that office. Opposing candidates undoubtedly will bring this deficiency, if it be one, to the attention of the electorate in the course of campaigning." *Id.* at 885.

Thus in every respect the two year residency requirement failed to withstand strict scrutiny.

The three judge court in *Headlee v. Franklin Co. Bd. of Elections, supra,* utilized a similar analysis. The *Headlee* court nullified an Ohio statute requiring one year of residency for village council candidates. Although the *Headlee* court arrived at the strict scrutiny tier by relying on the fundamental rights of voting and political advocacy, the court applied strict scrutiny in the same manner as the Sixth Circuit did in *Green.* The *Headlee* court reasoned that the residency qualification was an imprecise means to accomplish the asserted governmental objective of "preventing frivolous, fraudulent or unqualified candidates". 368 F.Supp. at 1003. It was both overinclusive and underinclusive. And there was a more fundamental defect in the durational residency requirement:

> "Whether or not a candidate has the necessary skill and knowledge of the community is a question ultimately for the voters to decide.
>
> > [The defendant] has failed to demonstrate that the election process is inadequate to weed out incompetent, unknowledgeable candidates, insensitive to, and unaware of, the best needs of the community. The hallowed belief in the wisdom and power of the electorate must not be sold short and may not be circumscribed by artificial residence barriers fencing in the right to vote or the right to be a candidate for public office.... *Thompson v. Mellon,* 9 Cal.3d 96, 107 Cal.Rptr. 20, 27, 507 P.2d 628 [635] (1973)." *Id.*

Implicit in the quoted language is the suggestion that, in order to justify a durational residency requirement, the governmental defendant has the burden of demonstrating that the election process per se is not a suitable means to select qualified and knowledgeable public officeholders.

Another representative opinion from this Circuit is *Mogk v. City of Detroit, supra.* There the unanimous three judge court struck down a Michigan statutory provision requiring three years residency for candidates for the Detroit city charter commission. Finding the fundamental rights of voting and free expression intertwined with the rights of candidacy, the court invoked the strict scrutiny/compelling state interest test. The court's analysis is worth quoting at length:

"Defendants claim that the three year residency requirement for candidates for the position of member of a charter revision commission is reasonable and understandable; that it takes into consideration that a person who has lived in the community for three years should be better acquainted with the problems of the city and with how they should be corrected. Curiously, a citizen who moves into the community thirty days before the election is presumably qualified to choose those best qualified for membership on the commission. Does this mean that voters can learn in thirty days what a prospective candidate can learn in not less than three years? It seems to us that there is here a strange inconsistency. It occurs to us further that the premise upon which the requirement rests, that is, that citizens who have resided in the municipality for three years next preceding the election are attached to the community and by some process are more aware of its problems and possess better solutions is tenuous at best. Who is to say that a late arrival in the community is not best qualified to fill the office here in question? The problems of one large city are basically no different from the problems of another; most are shared in common by all large cities. The classification here involved was perhaps a rational one for 1909, when the predominantly rurally-oriented legislature conceived of cities as larger towns—towns in which most of the inhabitants knew each other. We take judicial notice of what any city dweller knows, that tenants in a high-rise dwelling building know very few of their fellow tenants, and that even in single-family dwelling neighborhoods, acquaintanceship rarely encompasses more than persons living within the city block. Taking into account the realities of city life and the problems of the cities we can only conclude that the three year residency requirement has neither logic, reason nor experience to support it. Considering the functions and powers of the other public offices we have mentioned and the impact of the exercise of their powers on the lives of the resident electorate, it appears to us patent that no rational or justifiable excuse can be urged for the disparity in the durational residency requirement between candidates for these offices and the office here in question.

The basic scheme in any election system—including that of Michigan, is designed first, to identify and expose to public scrutiny those who come forward as candidates, and ultimately to select from them those who shall hold public office. Generally the time table of the state election machinery will suffice to accomplish the first objective. It is a matter of common knowledge that those who seek public office go to considerable effort and expense to secure exposure, and it may be safely assumed that opponents in an election race will seek out and make known the shortcomings of their opposition and assert their own superior qualifications for a particular post. If a short sojourn in the community is considered to be a disqualification the electorate may voice its sentiment at the ballot box." *Id.* at 700–701.

Finally, the position taken in this Circuit was aptly summarized by the Michigan Court of Appeals in a recent decision:

"[A] flat residency rule is too vague and overreaching to be upheld as the least burdensome method of protecting the city's interests ... the normal processes of our elective system will sufficiently insure that only qualified and knowledgeable candidates will gain office." *Grano v. Ortisi*, 86 Mich.App. 482, 495 [272 N.W.2d 693] (1978) (city charter two year requirement for municipal judge candidates).

Thus every case deciding this question in this Circuit has held that close scrutiny must be applied and that the durational residency requirements cannot survive this scrutiny. *See also, Alexander v. Kammer, supra* (two year city charter requirement for Pontiac, Michigan city commissioner); *Bolanowski v. Raich, supra* (three year city charter requirement for mayor of Warren, Michigan).

## II. THE ARGUMENT FOR UPHOLDING THE ONE YEAR RESIDENCY REQUIREMENT

On the whole the defendants concede the force of the foregoing argument. But, the defendants insist, the Court should not adopt at face value the reasoning and rhetoric of the cases involving residency requirements of more than one year. Without questioning the presence of fundamental rights and the consequent applicability of strict scrutiny, the defendants argue: first, it is incontrovertible that *some* durational residency requirements for candidates are constitutionally acceptable; second, in surveying the results obtained in the relevant cases, it is apparent that the overwhelming majority of the decisions striking candidate residency laws involved residency periods of *more than one year*; and in the decisions considering one year residency requirements, the overwhelming majority have *upheld* the challenged laws.

### A. *The Absurdity of Striking Down All Durational Residency Requirements for Candidates*

Initially, defendants suggest, plaintiff's argument (set out in Section I, *supra*) is suspect because the theory proves too much; if piously followed, the logic and language of the cases in this Circuit lead to the indefensible conclusion that *no* residency period for candidates can be constitutional. None of these cases, defendants assert, contains any suggestion that a shorter residency period might satisfy the compelling state interest test; instead these cases broadly imply that a period of residency—

whatever its length—is not sufficiently connected to the goals of having serious and knowledgeable candidates and an informed electorate. So, on the devastating reasoning of these cases, employing the complete arsenal of strict scrutiny techniques, it would be next to impossible to justify any particular period of residency, since there would always be conceivable exceptions and counterexamples, and there would always be less burdensome alternatives (such as some yet shorter period of residency, or else leaving the question of a candidate's fitness for office to the political process).[6] Yet this conclusion—that any durational qualifications for candidates would be invalid—is flatly inconsistent with the Constitution and recent Supreme Court decisions.

The United States Constitution prescribes that

"No person shall be a Representative who shall not have ... been seven years a citizen of the United States, and who shall not, when elected, be an inhabitant of the State in which he shall be chosen." U.S.Const. Art. I, § 2, cl. 2.

The Constitution imposes similar requirements on senators (nine years) and Presidents (fourteen years). Id., Art. I, § 3, cl. 3 and Art. II, § 1. Thus, durational requirements have been historically recognized as legitimate governmental concerns.

In addition, the Constitution grants to state legislatures the power to regulate elections and determine candidate qualifications. U.S.Const. Art. I, § 2, 4; Art. II, § 1. Almost every state has passed laws establishing durational residency requirements

---

**6.** This is not to say that the theory of strict scrutiny *necessarily* precludes a court from upholding a durational residency requirement for candidates. See discussion at Section III C *infra*. The point is simply that as the theory has been utilized in the cases in this Circuit it would be difficult to validate any particular durational residency requirement.

But consider,

"It is unlikely that any durational residency requirement could satisfy the compelling state interest standard. It is difficult to conceive of any set of circumstances which could be said to compel a specific durational period. A state would be hard put to justify why a few months or years more or less would not equally serve its purposes." *Sun-*

*unu v. Stark*, 383 F.Supp. 1287, 1292–1293, n. 1 (D.N.H. 197) (Campbell and Gignoux, concurring), *aff'd. mem.* 420 U.S. 958 [95 S.Ct. 1346, 43 L.Ed.2d 435] (1974). *Accord, Russell v. Hathaway*, 423 F.Supp. 833, 837–838 (N.D.Texas 1976).

Consider also:

"A judge would be unimaginative indeed if he could not come up with something a little less 'drastic' or a little less 'restrictive' in almost any situation, and thereby enable himself to vote to strike legislation down." *Illinois Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 188–189 [99 S.Ct. 983, 993, 59 L.Ed.2d 230] (1978) (Blackmun, J., concurring).

for various state and local public offices. "Developments in the Law—Elections", 88 Harv.L.Rev. 1111, 1217 (1975). The universal prevalence of such requirements casts some doubt on plaintiff's argument.

Moreover, the Supreme Court has directly held that some durational residency requirements for candidates are constitutional. In *Sununu v. Stark*, 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975) and *Chimento v. Stark*, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973), the Supreme Court affirmed lower court judgments upholding New Hampshire's seven year durational residency requirement for state senatorial and gubernatorial candidates against equal protection challenges. 383 F.Supp. 1287 (D.N.H.) and 353 F.Supp. 1211 (D.N.H.). Thus the Supreme Court, in decisions subsequent to the cases in this Circuit relied on by plaintiff, directly ruled that a seven year candidate residency law was constitutional.[7]

Finally in the analogous area of durational residency requirements for voters, the Supreme Court has expressly upheld some residency periods in the face of equal protection attacks. *Burns v. Fortson*, 410 U.S. 686, 93 S.Ct. 1209, 35 L.Ed.2d 633 (1973) and *Marston v. Lewis*, 410 U.S. 679, 93 S.Ct. 1211, 35 L.Ed.2d 627 (1973) (50 days held constitutional). *See also, Dunn v. Blumstein*, 405 U.S. 330, 347, 92 S.Ct. 995, 1005, 31 L.Ed.2d 274 (1972) (30 days).

The inescapable conclusion is that some durational residency requirements for candidates are constitutionally acceptable. *Woodward v. City of Deerfield Beach*, 538 F.2d 1081, 1084 (5th Cir. 1976).

**B. The Court Decisions Regarding One Year Residency Requirements**

The second step in defendants' argument focuses on the outcome of cases directly on point with the one at bar, that is, the cases considering the constitutionality of one year residency requirements for candidates.[8] The great majority of such cases have upheld one year requirements from equal protection attack. 65 A.L.R.3d 1048, § 22 (collecting cases). *E. g., Brandenberg v. McClellan*, 427 F.Supp. 943 (Mo.1977); *Daves v. City of Longwood*, 423 F.Supp. 503 (Fla.1976); *Russell v. Hathaway*, 423 F.Supp. 833 (N.D.Texas 1976). But see contra, *Headlee v. Franklin Co. Bd. of Elections, supra*, and *Johnson v. Hamilton*, 15 Cal.3d 461, 125 Cal.Rptr. 129, 541 P.2d 881 (1975).[9]

---

**7.** There is some disagreement about the meaning and import of the Supreme Court's summary affirmances in *Chimento* and *Sununu*. The plaintiff argues that such decisions are only binding on the parties in those cases. This is incorrect. A summary affirmance does not simply leave the judgment below standing untouched; a summary affirmance is a decision on the merits. *Hicks v. Miranda*, 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1974).

"[L]ower courts are bound by summary decisions by this Court 'until such time as the Court informs [them] that [they] are not.'" *Id.* at 344–345, 95 S.Ct. at 2289.

It is entirely true that the Supreme Court's summary decisions affirm the judgment below only, and do not indicate any approval of the reasoning of the lower court. *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1976). Thus the precedential significance of summary affirmances should not be overestimated; nor should these rulings be read expansively, beyond the facts of the case. *Id.* at 176–177, 97 S.Ct. at 2240–2241. But what is important here is that summary affirmances do represent Supreme Court decisions on the merits of the controversy presented in the case.

**8.** The defendants do not pause to contest plaintiff's doctrinal analysis of the issues in this case. The defendants are willing to concede, for instance, that strict scrutiny is appropriate. Defendants' brief, page 5. Defendants regard these theoretical matters as non-essential, since cases using different conceptual approaches have arrived at identical results and cases using identical approaches have arrived at opposite results. *Id.*

**9.** Apparently these two cases are the only reported cases striking down candidate residency requirements of one year or less. At oral argument plaintiff brought to the Court's attention two more cases which supposedly invalidated one year residency requirements on equal protection grounds, *Matthews v. Atlantic City, supra*, and *Marra v. Zink*, 256 S.E.2d 581 (W.Va. 1979). Plaintiff was mistaken as to *Matthews*; that case involved a two year requirement. The *Marra* case did involve a one year requirement, but the case is inapposite because the court did not strike down the requirement on

Similarly, the cases nullifying durational residency requirements for candidates, and suggesting that no residency requirement could survive strict scrutiny, are overwhelmingly cases involving periods much in excess of one year. Defendants, therefore, would read those cases narrowly and distinguish them on their facts.

So the defendants would divide the candidate residency laws into two camps: those with residency periods longer than one year (unconstitutional), and those with periods of one year or less (constitutional). The obvious impediment to this neat classification is the *Headlee* case. 368 F.Supp. 999 (Ohio 1973) (one year requirement invalidated). *Headlee* was decided by a three judge court in this Circuit, and so it has enhanced weight.

But *Headlee*, when analyzed carefully, does not pose an insurmountable difficulty because it is *sui generis*. In *Headlee*, the plaintiff seeking to run for office had lived in the same location for eighteen years, but within one year of the election the neighboring village annexed her residence. The village's annexations within one year of the election nearly doubled the size of the electorate in the village. Yet, of the 714 resulting electors, 342 were disqualified from holding office simply because their homes had been annexed within the last year. 386 F.Supp. at 1004.

So *Headlee* is an unusual case where the field of potential candidates was sliced in half by the one year residency law; thus the voters' choice was vastly restricted. Moreover, aside from the sheer numbers of persons precluded from seeking office, there were indications that the newly-annexed voters could have a community of interest and a particular viewpoint which might not be represented by candidates picked from the older residents of the village. In short, the uniqueness of the facts of *Headlee* mandate that *Headlee* cannot be considered a serious stumbling block to defendants' position.

In sum, both plaintiff and defendants have stated cogent, persuasive arguments. The Court is not faced with a choice between the two arguments so much as the necessity of reconciling the two arguments. On the one hand, the cases, especially the authoritative cases from this Circuit, clearly subject durational residency requirements to the most rigorous sort of strict scrutiny. The Sixth Circuit has emphatically nullified a two year requirement for city commissioner candidates, and apparently no case from this Circuit has upheld any durational residency requirement for candidates. On the other hand, there is no doubt that *some* candidate residency period is constitutional; and the courts have almost unanimously agreed that a one year requirement for municipal office is constitutionally acceptable.

## III. ALTERNATIVE MODES OF ANALYZING THE ISSUES

The problem as posed by the parties is not insoluble. While it is true that the strict scrutiny principle derived from the cases in this Circuit, if extended blindly, leads to the anomalous result that no durational requirement can be justified; the demonstrated absurdity of this conclusion calls into question the soundness of plaintiff's theory, and suggests that the premises of the cases on which plaintiff relies must be re-examined especially in light of subsequent developments in the Supreme Court. The most compelling cases relied on by plaintiff—the Sixth Circuit's decision in *Green v. McKeon* and the other decisions from courts in this Circuit—were all decided in 1973 or earlier. Since then the theoretical foundation of these opinions has been eroded and their position regarding candidate residency requirements has become tenuous.

This is not to say that these cases have been definitively overruled or refuted. But there are convincing reasons now to adopt a somewhat different approach to the ques-

---

the authority of the equal protection clause. Instead the *Marra* court held that the one year requirement was violative of the New Jersey state constitution, in that the local one year

qualification for office was in excess of the qualifications provided in the state constitution.

tions presented. The Court in fact will suggest three alternative approaches, each of which leads to the conclusion that plaintiff's motion for a preliminary injunction should be denied. First, there is reason to doubt whether the one year residency law actually impairs any fundamental constitutional rights; therefore, on the accepted two-tier model of equal protection, the law should only be tested by the criterion of reasonableness. Second, in the last decade the Supreme Court has frequently suggested that, at least in certain cases, the standard two-tier format of equal protection should be altered or abandoned. This is a good case for avoiding the extremes of the strict scrutiny and rational basis tests, and employing instead an intermediate standard of review. Third, assuming that fundamental rights are implicated here, and assuming that the two-tier theory continues to be mandatory in all equal protection cases, still, the strict scrutiny test leaves room for upholding some durational residency requirements.

A. *No Basis for Invoking Strict Scrutiny*

According to the orthodox two-tier model of equal protection, normally the courts will measure a legislative enactment by the criterion of mere rationality, *unless* the law in question implicates a fundamental right or a suspect classification—only then is the law judged by the exacting standards of strict scrutiny. With regard to the durational residency requirement for candidates here, there is reason to believe that the

rational basis standard of review should be applied, because there are no constitutional compulsions for employing strict scrutiny. "Developments in the Law—Elections", 88 Harv.L.Rev. 1111, 1218–1219, 1228–1229 (1975). Although there is slight case authority standing for the proposition that strict scrutiny is improper in the situation at bar, there is authority directly undermining the assumptions on which the strict scrutiny analysis is based.[10] The Court will address in turn the various fundamental rights which are said to be the sources of strict scrutiny where candidate residency requirements are concerned: the rights of voting, free speech, and candidacy, and the right of interstate travel.

1. *The Fundamental Right to Vote and Ancillary Rights of Political Advocacy*

Some cases involving candidate residency laws have held that strict scrutiny is anchored in the fundamental right to vote and in related rights of expression, association, and candidacy.[11] However, the Sixth Circuit has not adopted this premise. In the *Green* case, the Court of Appeals noted the cases in this Circuit which had found strict scrutiny appropriate because of the infringement on the rights of voters, but the Court of Appeals carefully avoided any reliance on this theory.[12]

In the context of restrictions on candidates, the seminal statement regarding the relevance of the rights of voters is contained in *Bullock v. Carter*, 405 U.S. 134, 92

**10.** Admittedly since 1973 there has not been any perceptible trend towards usage of the rational basis test in cases like the one at bar. If anything there is a tendency in the cases to accept the strict scrutiny test rather routinely, based on the momentum of precedent, without seriously investigating the assumptions which led other courts to choose strict scrutiny.

Still, since the relevant decisions in this Circuit there have been two more authoritative decisions which may indirectly imply that the rational basis test is to be used here: these are the Supreme Court's summary decisions in *Sununu v. Stark*, 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975) *aff'd mem.* 383 F.Supp. 1287, and *Chimento v. Stark*, 414 U.S. 802, 94 S.Ct. 125, 38 L.Ed.2d 39 (1973) *aff'd mem.* 353 F.Supp. 1211. *Sununu* is particularly telling. In that case the Supreme Court approved a judgment upholding a *seven year* state residen-

cy requirement for candidates to the New Hampshire state senate. Of course one must be cautious about speculating as to the Supreme Court's reasoning in summary affirmances, but one is forced to wonder how the bona fide strict scrutiny test could be applied to uphold the overbroad seven year residency requirement for New Hampshire state senate candidates.

**11.** See pages 1322–1323, *supra.*

**12.** The Court of Appeals said,

"In light of the alternative ground for affirmance set forth below, we do not pass on the question of whether the impact of Plymouth's charter provision on the exercise of the franchise is sufficient to satisfy the criteria of *Bullock* to trigger application of the more stringent standard." 468 F.2d at 884.

S.Ct. 849, 31 L.Ed.2d 92 (1972).[13] At issue in *Bullock* was the constitutionality of Texas' substantial filing fees required of candidates for state and local offices. The Court discussed the proper standard of review, with reference to the effect of these laws on the rights of voters.

"The initial and direct impact of filing fees is felt by aspirants for office, rather than voters, and the Court has not heretofore attached such fundamental status to candidacy as to invoke a rigorous standard of review. However, the rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at least some theoretical correlative effect on voters. *Of course, not every limitation or incidental burden on the exercise of voting rights is subject to a stringent standard of review. McDonald v. Board of Election,* 394 U.S. 802 [89 S.Ct. 1404, 22 L.Ed.2d 739] (1969). Texas does not place a condition on the exercise of the right to vote, nor does it quantitatively dilute votes that have been cast. Rather, the Texas system creates barriers to candidate access to the primary ballot, thereby tending to limit the field of candidates from which voters might choose. *The existence of such barriers does not of itself compel close scrutiny.* Compare *Jenness v. Fortson,* 403 U.S. 431 [91 S.Ct. 1970, 29 L.Ed.2d 554] (1971), with *Williams v. Rhodes,* 393 U.S. 23 [89 S.Ct. 5, 21 L.Ed.2d 24] (1968). *In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." Id.* at 142–143, 92 S.Ct. at 855–856 (emphasis supplied).

The Supreme Court concluded that strict scrutiny was necessary for two reasons: first, "voters [are] substantially limited in their choice of candidates" by this "patently exclusionary" mechanism; second, the candidate filing fees (which ranged as high as $8,900) were said to "fall[] with unequal weight on voters as well as candidates, according to their economic status." [14]  *Id.* at 143–144, 92 S.Ct. at 855–856. The Court summarized its conclusions:

"Because the Texas filing-fee scheme has a real and appreciable impact on the exercise of the franchise, and because this impact is related to the resources of the voters supporting a particular candidate, we conclude, as in *Harper* [*Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169], that the laws must be 'closely scrutinized' and found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." *Id.* at 144, 92 S.Ct. 856.

There are several lessons to be drawn from the Bullock decision. First, there is no distinct constitutional right to run for public office. The Supreme Court in *Bullock* refused to recognize such a right, L. Tribe, *American Constitutional Law* (1978) at 775; and a number of lower courts have held that there is no special constitutional protection for the interests of candidates. *Walker v. Yucht,* 352 F.Supp. 85 (D.Del.1972); *Matthews v. Atlantic City, supra.*[15]  See also "Developments in the

---

**13.** *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), is also occasionally cited in this regard. The issue in *Dunn* was the constitutionality of durational residency requirements for voting. The Supreme Court declared that where the "challenged statute grants the right to vote to some citizens and denies the franchise to others," strict scrutiny must be applied. *Id.* at 337, 92 S.Ct. at 1000. Some lower courts have erroneously relied on sweeping dicta in *Dunn* * and automatically assumed that strict scrutiny applies to durational requirements for candidates as well.

* "In sum, durational residency laws must be measured by a strict equal protection test." *Id.* at 342, 92 S.Ct. at 1003.

*Bullock v. Carter* addresses the question of whether restrictions on candidates are to be tested by the same high standards as *Dunn v. Blumstein* used for direct restrictions on voters.

**14.** It is noteworthy that even on the circumstances presented in *Bullock* the Supreme Court did not use the strict scrutiny test in its purest textbook form. Instead the Court used a reduced version of the classic strict scrutiny criteria, merely asking whether the law as "reasonably necessary" to advance "legitimate state objectives". *Daves v. City of Longwood, supra* and *Russell v. Hathaway, supra.* See the discussion in Section III. B of this Opinion.

**15.** In *Green v. McKeon* the Sixth Circuit held that strict scrutiny was appropriate because

Law—Elections", 88 Harv.L.Rev. 1111, 1175–1177.

. Second, of the two grounds for using strict scrutiny in *Bullock,* one is obviously absent in the case at bar. Since residency laws do not impose *financial* restrictions on candidacy, it cannot be said here that there is a "disparity of voting power based on wealth". *Bullock v. Carter, supra* 405 U.S. at 144, 92 S.Ct. at 856. *See, Manson v. Edwards,* 482 F.2d 1076 (6th Cir. 1973) (holding that the single critical factor in *Bullock* was wealth discrimination). Restrictions on ballot access are suspect when they discriminate among candidates or voters on the basis of wealth or poverty. *Walker v. Yucht, supra* at 90, 93. *See, e. g., Harper v. Va. Bd. of Education,* 383 U.S. 663, 670, 86 S.Ct. 1079, 1083, 16 L.Ed.2d 169 (1966) (poll tax); *Turner v. Fouche,* 396 U.S. 346, 362–363, 90 S.Ct. 532, 541, 24 L.Ed.2d 567 (1970) (feeholder requirement for school board membership).

Third, and most significant, the Supreme Court held that restrictions on candidates' ballot access do not automatically or categorically require close scrutiny, even though such barriers may indirectly affect the voters. The Court emphasized that the need for strict scrutiny might arise if, after "realistic" examination of the circumstances of the case, it is concluded that the candidate restrictions have a "real and appreciable

impact" on the voters' rights. In *Bullock* the Supreme Court found that the burden on voters was "neither incidental nor remote" because so many office seekers were excluded that the voters' choice of candidates was "substantially limited", and because the law especially burdened a group of voters forming a particular constituency with a common viewpoint (the poor). Thus the critical inquiry is whether the challenged law substantially diminishes the field of candidates (and thus substantially diminishes voter choice) and whether the law has a disparate impact on a cognizable political group.[16] Tribe, *supra* at 775 and n. 4.

In the case at bar there is no indication that the one year residency requirement has had an inordinate impact on any discrete political group; the residency requirement appears to be politically and ideologically neutral. Nor is there any suggestion that the field of choice has been drastically reduced because, for example, the city has had a great influx of new residents in the past year. Thus in every essential respect the law in dispute here differs from the steep filing fees in *Bullock.*[17] The Court must conclude that the city's durational residency requirement, viewed "in a realistic light", does not burden protected interests in voting, candidacy or association; so strict scrutiny is not triggered—minimal scrutiny

---

candidate durational residency laws curtailed the right of interstate travel by discriminating against new residents. The Court went on to say,

"It is not material that the classification denies new residents something that is not a constitutional right, i. e., the right to become a candidate for public office." 468 F.Supp. at 884.

16. "[L]imitations on candidate eligibility do not infringe the fundamental right of the supporters of candidates to associate for the advancement of political ideas so long as a sufficient number of candidates are eligible to represent the views of any particular constituency. Although it is possible to imagine cases in which eligibility requirements would substantially limit the pool of potential office-seekers so as to burden a particular constituency's ability to find a qualified candidate or restrict candidacy along ideological lines, except in unusual cases the impact of eligibility requirements on the right of individuals to

associate is not significant enough to trigger heightened constitutional scrutiny." "Developments in the Law—Elections", 88 Harv.L. Rev. 1111, 1218.

"Effective voter participation must be evaluated by the scrutiny of statutory candidacy qualifications to determine if in application, they prohibit ballot access to candidates with vested interests, experiences and sympathies similar to one segment of the populace but allow candidates with antithetical views to be elected. The test must be: Is any substantial political group effectively precluded from ballot access?

"The Emerging Right to Candidacy: Constitutional Protection of the Voter, the Candidate, and the Political Group", 17 Wayne L.Rev. 1543, 1556 (1971).

17. The *Headlee* case also is distinguishable in these respects. *See* discussion at Section II, page 1327, *supra.*

is appropriate. "Developments in the Law—Elections", 88 Harv.L.Rev. 1111, 1218–1219; *Daves v. City of Longwood, supra; Walker v. Yucht, supra.*

Although *Green v. McKeon* was not decided on this ground, some district court cases in this Circuit have indicated that durational residency requirements interfere with the rights of voters and so must be strictly scrutinized. But these cases for the most part were decided before the Supreme Court's opinion in *Bullock v. Carter; Bullock v. Carter* undermines the assumption in these cases that voting rights are significantly impaired by any and all durational residency requirements for candidates. *See, e. g., Mogk v. City of Detroit, supra* (1971) and *Bolanowski v. Raich, supra* (1971).

It is true that *Headlee v. Franklin Co. Bd. of Elections, supra* (1973) and *Alexander v. Kammer, supra* (1973) were decided after *Bullock v. Carter.* But, as already mentioned, *Headlee* is distinguishable on its facts; and the *Headlee* court did not assume that durational residency restrictions are *per se* impairments of voting rights. Moreover, the courts in *Headlee* and *Alexander* apparently did not have the benefit of the Sixth Circuit's opinion in *Manson v. Edwards,* 482 F.2d 1076 (6th Cir. 1973). That case involved a challenge to the minimum age restriction (25 years) for Detroit city council. The judge there, who also decided *Alexander* and *Bolanowski,* had held that the age eligibility requirement was unconstitutional, using a strict scrutiny test because of the impact on voting rights. The Sixth Circuit read *Bullock v. Carter* as resting primarily on the wealth discrimination inherent in Texas' excessive filing fees. Since no wealth discrimination was involved

in the age requirement, and since the egregious circumstances of *Bullock* were not present, the Sixth Circuit concluded,

"We disagree with the District Court and hold that the rational basis test is to be applied here." 482 F.2d at 1078.

■ Thus it is safe to say that this Court's conclusion is not inconsistent with the present law of the Circuit. The Court concludes that the one year residency requirement does not significantly impair the rights of voters so as to give rise to strict scrutiny review.[18]

### 2. The Fundamental Right of Interstate Travel

One of the fundamental rights which is said to trigger strict scrutiny is the right to interstate travel.[19] This is of significance in the case at bar because it has the imprimatur of the Sixth Circuit. In *Green v. McKeon,* the Sixth Circuit, after carefully sidestepping any reliance on fundamental rights of voting, candidacy, or political expression, found strict scrutiny anchored in the right to interstate travel. Unfortunately, *Green v. McKeon* contains only a cursory discussion of the reasons for this course:

"The durational residency requirement at issue classifies Plymouth residents on the basis of recent travel. That classification alone requires that the requirement be strictly scrutinized because it operates to penalize the exercise of the basic constitutional right to travel. *Dunn v. Blumstein,* 405 U.S. 330, 338 [92 S.Ct. 995, 1001, 31 L.Ed.2d 274] (1972)." 468 F.2d at 884.

The Sixth Circuit apparently considered further analysis unnecessary in light of the Supreme Court's dictum in *Dunn v. Blumstein;* standing alone, the classification on

---

18. Plaintiff makes one novel First Amendment argument. Plaintiff suggests that elections constitute a "public forum" and that any selective restriction on access to this arena must be examined according to compelling state interest standards. Plaintiff does not cite any cases adopting this public forum theory with regard to elections. In fact, a review of the Supreme Court's election decisions reveals no mention of such an argument, or any analogy of elections to public forums such as public parks or street corners. *Bullock v. Carter* itself would seem to

have implicitly rejected this analysis: "the existence of such barriers [limiting candidates' ballot access] does not of itself compel close scrutiny". 405 U.S. at 143, 92 S.Ct. at 856.

19. There is no doubt that the right of interstate travel is a fundamental constitutional right. *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969). For cases holding that the right of interstate travel occasions strict scrutiny with regard to candidacy restrictions, see pages 1322–1323, *supra.*

the basis of recent travel was thought to necessitate close scrutiny.

However, as mentioned above, it has since been established that durational residency requirements are not *per se* infringements of the right of interstate travel triggering strict scrutiny. *Sosna v. Iowa*, 419 U.S. 393, 406, 95 S.Ct. 553, 560, 42 L.Ed.2d 532 (1975); *Memorial Hospital v. Maricopa Co.*, 415 U.S. 250, 258–259, 94 S.Ct. 1076, 1082, 39 L.Ed.2d 306 (1974); *Matthews v. Atlantic City, supra* at 1019; *Walker v. Yucht, supra* at 94–95; *Cf. Shapiro v. Thompson*, 394 U.S. 618, 638, n. 21, 89 S.Ct. 1322, 1333, n. 21, 22 L.Ed.2d 600 (1969). Thus the Sixth Circuit's assumption in *Green v. McKeon* has been belied by developments in the Supreme Court. The Supreme Court, in the right to travel context, has now upheld state durational residency conditions on licenses to practice law, *Rose v. Bondurant*, 409 U.S. 1020, 93 S.Ct. 460, 34 L.Ed.2d 312, aff'g mem. D.C., 339 F.Supp. 257 (6 months), lower tuition at state institutions of higher education, *Sturgis v. Washington*, 414 U.S. 1057, 94 S.Ct. 563, 38 L.Ed.2d 464, aff'g mem. D.C., 368 F.Supp. 38 (one year); and the right to obtain a divorce, *Sosna v. Iowa, supra* (one year). On the other hand, the Supreme Court has held that durational residency restrictions on certain other benefits or privileges *do* sufficiently implicate the right to travel so as to require strict scrutiny: non-emergency medical care for indigents, *Memorial Hospital v. Maricopa Co., supra*, welfare benefits, *Shapiro v. Thompson, supra*; and voting, *Dunn v. Blumstein, supra*.

The Supreme Court's fullest explanation of these right of interstate travel cases is contained in *Maricopa*. The Court quoted *Dunn v. Blumstein, supra*, 405 U.S. at 340, 92 S.Ct. at 1002.

"In *Shapiro* we explicitly stated that the compelling-state interest test would be triggered by 'any classification which serves to *penalize* the exercise of that right [to travel] ...'" (Emphasis in original; footnote omitted.)

The Supreme Court then explained:

"Thus, *Shapiro* and *Dunn* stand for the proposition that a classification which 'operates to *penalize* those persons ... who have exercised their constitutional right of interstate migration,' must be justified by a compelling state interest. *Oregon v. Mitchell*, 400 U.S. 112, 238 [91 S.Ct. 260, 321, 27 L.Ed.2d 272] (1970) (separate opinion of Brennan, White and Marshall, JJ.) (emphasis added). Although any durational residence requirement imposes a potential cost on migration, the Court in *Shapiro* cautioned that some 'waiting-period[s] ... may not be penalties." 394 U.S., at 638 n. 21 [89 S.Ct. at 1333 n. 21]. In *Dunn v. Blumstein, supra*, the Court found that the denial of the franchise, 'a fundamental political right,' *Reynolds v. Sims*, 377 U.S. 533, 562 [84 S.Ct. 1362, 1381, 12 L.Ed.2d 506] (1964), was a penalty requiring application of the compelling-state-interest test. In *Shapiro*, the Court found denial of the basic 'necessities of life' to be a penalty. Nonetheless, the Court. has declined to strike down state statutes requiring one year of residence as a condition to lower tuition at state institutions of higher education. Whatever the ultimate parameters of the *Shapiro* penalty analysis, it is at least clear that medical care is as much 'a basic necessity of life' to an indigent as welfare assistance." 415 U.S. at 258–259, 94 S.Ct. at 1082. (Original emphasis.)

■ The crucial inquiry in the Supreme Court's "penalty" analysis is whether the underlying benefit denied to recently arrived residents is itself a fundamental right (such as voting) or a basic necessity of life (such as welfare benefits for indigents). Tribe, *supra* at 1004; "Developments in the Law—Elections", 88 Harv.L.Rev. 1111, 1228–1229. If the underlying benefit or privilege does not come within these two currently identified categories, then laws which deny the benefit to recently arrived residents do not "penalize" the fundamental right of interstate travel; therefore, such laws may be reviewed by the traditional rational basis test.[20] *Sosna v. Iowa, supra*; "Developments", *supra* at 1228–1229.

**20.** Only durational residency restrictions on access to (1) fundamental rights or (2) necessar-  ies of life constitute penalties on the right of interstate travel which would trigger strict

The one year residency requirement for candidates to the Birmingham city commission is not a penalty affecting the exercise of the fundamental right of interstate travel. *Walker v. Yucht, supra* at 97; *Matthews v. Atlantic City, supra* 417 A.2d at 1019. First, as demonstrated *supra*, the requirement does not impair any underlying fundamental right, such as voting or freedom of speech. Second, candidacy is not a basic necessity of life, the deprivation of which would have "dire" or "cruel" effects on recently arrived residents. *Memorial Hospital v. Maricopa Co., supra* 415 U.S. at 261, 94 S.Ct. at 1083. It is also abundantly clear that the city charter provision could only have a tenuous, remote, and incidental effect on actual interstate travel. *Walker v. Yucht, supra* at 94–95; *Draper v. Phelps,* 351 F.Supp. 677 (Okl.1972). Far from being a real impediment to the exercise of this constitutional right, it is barely imaginable that a person would be deterred from moving to Birmingham from another state because he or she would be unable to become a candidate for office in Birmingham that year.

In short, the fundamental right of interstate travel provides no basis for invoking strict scrutiny here. Nor does the challenged residency law implicate any other fundamental right or suspect classification. *See* Section III A 1 above. Therefore, there is no cause for heightened scrutiny; under the orthodox two-tier model of equal protection the city charter provision need only be evaluated according to the lenient "reasonable basis" standards.

### B. *An Intermediate Standard of Review*

#### 1. *The Emergence of a Middle Path*

Although strict scrutiny is inapplicable to the issues presented in this case, there may be alternative standards of review other than the deferential rational basis test. In the last decade the Supreme Court has substantially modified the two-tier framework of equal protection analysis. G. Gunther "Forward—In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection", 88 Harv.L.Rev. 1 (1972); *Matthews v. Atlantic City,* 417 A.2d 1011, 1018 (N.J.1980) (collecting cases); *see generally,* Symposium on Equal Protection, the Standards of Review: The Path Taken and the Road Beyond, 57 U.Det.J.Urb.L. 701 (1980).

> "There seems little likelihood that equal protection analysis will ever again be neatly separable into two dramatically polar forms of review." L. Tribe, *supra* at 1089.

There is widespread dissatisfaction with the conventional two-tier format of equal protection. *E. g., Craig v. Boren,* 429 U.S. 190 at 210–211, 97 S.Ct. 451 at 463–464, 50 L.Ed.2d 397 (Powell, J., concurring) and at 211–212 (Stevens, J., concurring); *Dan-*

---

scrutiny. But, it can be argued this right-to-travel analysis is redundant when applied to the first category of penalties, i. e., to residency qualifications on access to fundamental rights. If a law denies a fundamental right to a class of persons, then the law must be subjected to strict scrutiny, according to the conventional two-tier theory of equal protection. There would not seem to be a need to resort to the right-to-travel theory in order to subject the law to strict scrutiny.

In fact *Dunn v. Blumstein, supra,* is the only case where the Supreme Court found that the fundamental right to travel was penalized because of the denial of the first category of benefit (above), i. e., the denial of a separate fundamental right. Although the Supreme Court appeared to rely on two grounds of decision in *Dunn*—abridgement of voting rights and also abridgement of the right of interstate travel—the right-to-travel analysis may be su-

perfluous. The Court's decision followed inevitably and immediately from its conclusion that the right to vote had been violated.

In this equal protection context it appears that the only independent context of the right of interstate travel concerns the second branch of the "penalty" analysis: the basic necessities of life. All of the Supreme Court's right-to-travel decisions, except for Dunn, involved this category of benefits. It becomes clear, then, that in essence the right-to-travel cases have centered on economic entitlements. Some commentators have therefore interpreted the right-to-travel cases as an episode of the Warren Court's solicitude towards the poor. Tribe, *supra* at 1005; W.M.H. Clune, "Wealth Discriminations under the Fourteenth Amendment", 1975 Sup.Ct. Review 289, 320, *Cf. Memorial Hospital v. Maricopa Co.,* 415 U.S. 250, 270, 94 S.Ct. 1076, 1088, 39 L.Ed.2d 306 (1974) (Douglas, J., concurring).

*dridge v. Williams*, 397 U.S. 471, 519–521, 90 S.Ct. 1153, 1178–1180, 25 L.Ed.2d 491 (1970) (Marshall, J., dissenting). A major complaint is that the two-tier dichotomy is too rigid and inflexible, so it leads to artificial "result-oriented" manipulations. *Illinois St. Bd. of Elections v. Soc. Workers Party*, 440 U.S. 173, 188–189, 99 S.Ct. 983, 992–993, 59 L.Ed.2d 230 (1979) (Blackmun, J., concurring).

> "If a statute is subject to strict scrutiny, the statute always or nearly always, is struck down. Quite obviously, the only critical decision is whether strict scrutiny should be invoked at all ... For [the mere rationality] test too, when applied as articulated, leaves little doubt about the outcome; the challenged legislation is always upheld." (Marshall, J., dissenting) *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 320 [96 S.Ct. 2562, 2570, 49 L.Ed.2d 520] (1976).

> *See also Dunn v. Blumstein*, 405 U.S. 330, 363–364 [92 S.Ct. 995, 1013, 31 L.Ed.2d 274] (1972) (Burger, C. J., dissenting).

The commentators have also voiced this objection:

> "The all-or-nothing choice between minimum rationality and strict scrutiny ill-suits the broad range of situations arising under the equal protection clause, many of which are best dealt with neither through the virtual rubber stamp of truly minimal review nor through the virtual death-blow of truly strict scrutiny ..." Tribe, *supra* at 1089.

Although a majority of the current Supreme Court justices have suggested that the two-tier model is inadequate, and although the Court's decisions in the equal protection area have reflected this sentiment, the Court's direction is still unclear. The two-tier scheme has not yet been replaced with any "coherent and comprehensive—and consistently applied—consensus regarding equal protection analysis". G. Gunther, Constitutional Law Cases and Materials, 1979 Supp. at 111. *See also* Symposium, supra at 913–916. There have been proposals to abandon the classic tiers altogether in favor of a unified approach in all equal protection cases. For example, Justice Rehnquist has at times indicated that the traditional rational basis test should be applied across the board in equal protection cases (except where race is involved). *Trimble v. Gordon*, 430 U.S. 762, 777–786, 97 S.Ct. 1459, 1468–1473, 52 L.Ed.2d 31 (1977) (Rehnquist, J., dissenting). Other justices have at times suggested that there is a single general principle of review in all equal protection cases, although this standard involves balancing many factors. *Craig v. Boren*, 429 U.S. 190, 211–213, 97 S.Ct. 451, 464–465, 50 L.Ed.2d 397 (1976) (Stevens, J., concurring). Still other justices have explained the Court's approach to equal protection as a "spectrum of standards", a sliding scale or continuum ranging from extreme deference to stringent scrutiny, depending on the type of case.[21] *San Antonio Indpt. School District v. Rodriguez*, 411 U.S. 1, 98–99, 93 S.Ct. 1278, 1329–1330, 36 L.Ed.2d 16 (1973) (Marshall, J., dissenting); *Vlandis v. Kline*, 412 U.S. 441, 458–459, 93 S.Ct. 2230, 2239–2240, 37 L.Ed.2d 63 (1973) (White, J., concurring).

So far, at least, it appears that the dissatisfaction with the orthodox two-tier model has not led to the abandonment of the strict scrutiny nor of the rational basis tests in certain classes of cases. G. Gunther, "Forward" *supra; Matthews v. Atlantic City, supra.* Rather, a middle path has been opened. Generally this intermediate level of review has been applied to cases where there is differential treatment of sensitive (but not "suspect") classes, and where important (but not "fundamental") individual interests are at stake, or where constitutionally preferred interests are indirectly affected. Tribe, *supra* at 1089–1090; *Matthews v. Atlantic City, supra* 417 A.2d at 1019.

Although the contours of this middle path are not clearly defined, the Supreme Court has formulated the standard in general terms, blending elements of the two con-

---

**21.** One ambiguity in the Supreme Court's discussion of this problem is whether the various proposed analytic models of equal protection are meant to be merely descriptive (what the Court has in fact been doing), or whether they are intended to be prescriptive as well (what the Court should be doing).

ventional tests. The intermediate level of review requires that the challenged law be "found reasonably necessary to the accomplishment of legitimate [governmental] interests". *Lubin v. Panish*, 415 U.S. 709, 718, 94 S.Ct. 1315, 1321, 39 L.Ed.2d 702 (1974). The question is "whether there is an appropriate governmental interest suitably furthered by the differential treatment." *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2289, 33 L.Ed.2d 212 (1972).[22]

■ It is entirely appropriate to employ this intermediate standard of review in the case at bar. In the first place, the middle tier has been used or adumbrated by the Supreme Court in cases dealing with ballot access and the right of interstate travel. *E. g., Lubin v. Panish*, 415 U.S. 709, 718, 94 S.Ct. 1315, 1320, 39 L.Ed.2d 702 (1974) (candidate filing fees). *Cf. Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (residency period for divorce).[23] For example, in *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) (candidate filing fees), the Supreme Court posed the "threshold question",

"Whether the filing fee system should be sustained if it can be shown to have some rational basis, or whether it must withstand a more rigid standard of review." *Id.* at 142, 92 S.Ct. at 855.

After concluding that the challenged law substantially impinged upon the fundamental rights of voters and the less affluent segments of the community, the Court still did not use the strict scrutiny/compelling state interest test. Instead the Court concluded that the law must be

"found reasonably necessary to the accomplishment of legitimate state objectives in order to pass constitutional muster." *Id.* at 144, 92 S.Ct. at 856.

While fundamental rights are not significantly affected or burdened in the case at bar, the interests of newly arrived residents are certainly important. Legislation indirectly touching on these important interests deserves that special judicial attention usually absent in the traditional deferential standard of review.

"Indisputably, the State ... has intruded into a constitutionally sensitive area, laced with the penumbrae of protected associational conduct as voting, travel and the mechanistic heart of government, candidacy. The judiciary ought to give notice that the area, is in fact, sensitive. Though a fundamental interest is not directly hit and a wholly suspect criterion is not used, state intrusions into this milieu ought to be measured by objective and exacting standards." *Russell v. Hatha-*

22. These formulations of course do not provide definite guidance. *Craig v. Boren*, 429 U.S. 190, 221, 97 S.Ct. 451, 469, 50 L.Ed.2d 397 (1976) (Rehnquist, J., dissenting); *Mass Bd. of Retirement v. Murgia*, 427 U.S. 307, 317–327, 96 S.Ct. 2562, 2568–2573, 49 L.Ed.2d 520 (1976) (Marshall, J., dissenting). They do at least steer a course between strict review which "demands perfection" of the legislature, and lenient review, which amounts to "toothless deference". *Dunn v. Blumstein*, 405 U.S. 330, 363–364, 92 S.Ct. 995, 1013, 31 L.Ed.2d 274 (1972) (Burger, C. J., dissenting); Gunther, "Forward", *supra*. More objective formulas may eventually be devised. For now, as this area of the law is in flux, courts will have to balance and experiment, with the consequent risk that the decisions may appear inconsistent and unprincipled.

23. It is unclear what standard of review the Court utilized in *Sosna v. Iowa, supra*, although it was clearly not strict scrutiny. "Supreme Court 1974 term", 89 Harv.L.Rev. 49, 88–92 (1975). *Sosna v. Iowa* may indicate that the Court is ready to abandon the categorical "pen-

alty" analysis in right to travel cases. *See* Section III A 2, *supra*. Instead of using strict scrutiny when the challenged law can be defined as a "penalty" and using the rational basis test if the law cannot be so defined, the Court may be prepared to use a balancing test for all such right to travel cases. The second Justice Harlan originally suggested such a balancing approach in *Shapiro v. Thompson*, 394 U.S. 618, 655–677, 89 S.Ct. 1322, 1342–1352, 22 L.Ed.2d 600 (1968) (Harlan, J., dissenting). The factors to be considered would include: the importance of the benefit withheld from recently arrived residents (this includes both the severity of the effects on the lives of these recently arrived residents who are denied the benefit and the constitutional stature of the benefit itself); the extent of the interference with interstate travel (i. e., the actual likelihood of deterring such travel); the legislative intent (did the legislature try to restrict migration?); and the governmental interests fostered by the law.

*way,* 423 F.Supp. 833, at 838 (N.D.Texas 1976).

Finally, the cases involving durational residency requirements for candidates are good illustrations of the inadequacy of the two-tier framework. The many disparate decisions in this area testify to the need for some formula less clumsy and inflexible than is provided in the two-tier scheme of equal protection. The gap between the two poles of equal protection has proved most disturbing in these cases—where the threshold inquiry as to the standard of review has no clear or settled answer. Everything rides on the initial—and often formalistic—inquiry regarding the presence of specially protected constitutional interests: thus the Court's focus may be deflected from the actual merits of the particular legislation in controversy.

The dilemma is compounded in these candidate residency cases, because not only is the preliminary inquiry (regarding the level of review) extremely close, but the factual application of the standard of review calls for fine distinctions. The blunt instruments of two-tier review are not designed to decide whether a one-year residency requirement is distinguishable from a two-year or a six-month requirement.

Faced with these dilemmas, some courts in these cases have sworn formal allegiance to the two-tier theory, but in fact used the theory in unorthodox ways. Other courts have continued to use the dual standards according to the original recipes.[24] In short, the "newer" intermediate level of review should be applied in cases challenging durational residency requirements for candidates. *Russell v. Hathaway,* 423 F.Supp. 833 (Texas 1976); *Matthews v. Atlantic City,* 84 N.J. 153, 417 A.2d 1011, 1025 (1980).

## 2. Applying the Standard of Review to the Facts Presented

■ The one year residency requirement serves several appropriate and legitimate governmental interests: (1) the interest in exposing candidates to the scrutiny of the electorate, so voters may make informed choices; (2) the interest in protecting the community from outsiders who are interested only in their own selfish ends and not seriously committed to the community;[25] and (3) the interest in having officeholders who are familiar with the problems, interests, and feelings of the community. The plaintiff does not suggest that these interests are unimportant.[26] Rather plaintiff ar-

**24.** The *Chimento* and *Sununu* cases epitomize the confusion and contradiction which result from the two-tier dichotomy as applied to candidate residency laws. 353 F.Supp. 1211; 383 F.Supp. 1287. The three judge court in these cases wrestled with the strict scrutiny and rational basis tests, and finally upheld the seven year qualifying period at issue.

The lead opinion in *Chimento,* for example, ostensibly used the compelling state interest standard because the residency law affected fundamental rights of voting and travel. 353 F.Supp. at 1214. But the lead opinion also declared that the law's

"limiting effect upon the voters' choice of candidates is more hypothetical than real" (pages 1215–1216)

and the law

"cannot be said to adversely affect the democratic election process or the voters' participation therein" (page 1218).

The lead opinion went on to say:

"Candidate durational residency requirements do not 'penalize' the right to travel ... It cannot seriously be argued that the inability to run for Governor is a real impediment to interstate travel." (page 1218)

The lead opinion then found the seven year requirement justified under the strict scrutiny test.

The concurring opinion reached the same result using the ordinary rational basis standard and suggested that in fact the lead opinion also had applied the lenient standard of review.

Then in *Sununu,* the lead opinion used strict scrutiny simply because of the *Chimento* precedent and because the state defendant conceded this point. 383 F.Supp. at 1290. The concurring opinion, which was unquestionably the majority view since it was signed by two of the three judges, again suggested that the law could not possibly be upheld if the compelling state interest test was applied. Id. at 1292. *See also* discussion at page 1325, *supra.*

**25.** This is a traditional ground and there should be no implication of any personal reference.

**26.** Plaintiff does make the argument that in our democracy there is always a less drastic means to achieve these purposes: the voting process itself is the constitutionally-established way of selecting qualified officeholders. This "less

gues that the means adopted by the city are not closely tailored to achieving these worthy goals.

With regard to the first rationale for this law, it is true that during the course of a modern campaign candidates are exposed to public scrutiny by the mass media. Yet even as modern communications systems have allowed more people to be informed about a candidate in a shorter period of time, the techniques of advertising and public relations have also enabled candidates to manipulate and control their public image. One who lives among city residents for a substantial period of time will usually reveal himself to his neighbors in ways which will not appear in newspaper advertisements or televised debates. And it can safely be assumed that his neighbors will talk to others about him. Knowing the character of a candidate may be as important as knowing his publicly-stated views on the issues.[27] And of course the election process itself cannot insure that voters will be informed about the candidates. The city has "important interests" in "protecting the integrity of the political process from frivolous or fraudulent candidates" and "avoiding voter confusion, deception and frustration". *Jenness v. Fortson*, 403 U.S. 431, 442, 91 S.Ct. 1970, 1976, 29 L.Ed.2d 554 (1971); *Bullock v. Carter*, 405 U.S. 134, 145, 92 S.Ct. 849, 856, 31 L.Ed.2d 92 (1972).

The city's law also serves the interest in protecting the citizens from "raiders" who are not seriously committed to the interests of the community. It is fair to assume that the long time resident has had a stake in the community and has not moved there merely to further his own political career.

Of course the residency requirement is overbroad in this regard, since it bars many newcomers who are seriously interested in the community. But on this score the requirement is at least an effective means of achieving the governmental purpose.

Finally, there is the interest in having knowledgeable candidates. Plaintiff argues that the residency law is both overinclusive and underinclusive in this regard, and that the election itself can assure that only qualified and concerned candidates become officeholders. This latter assumption is unprovable, and in fact, it may be wholly incorrect. While it is true that long time residents may be ignorant of municipal affairs, and recently arrived residents may be well-informed, these counter-examples are neither conclusive nor convincing. With no evidence in the record, the hypothetical about the recently-arrived expert on local government is purely speculative. The charter provision does not appear to be overinclusive in this respect. It is true that perhaps it is more likely underinclusive (allowing ignorant long-time residents to run), but the long-time resident necessarily acquires a familiarity with the conditions, aspirations and needs of the community. This "feel" for the community is not easily imparted by the newcomer's crash course in local affairs.

In sum, the one year residency rule is more than merely logically related to the achievement of the governmental objectives; the rule bears a real and substantial relationship to those objectives. This does not mean that the city charter provision will guarantee or assure that the city's ob-

---

drastic means" argument might better be understood as an argument about the relative importance of the asserted governmental interests. In effect, plaintiff contends that while the asserted governmental interests may be substantial, they are not as weighty or compelling as the interest in having the voters decide, on election day, who should represent them.

If the Court had to apply the *compelling* state interest test, this argument might be persuasive. Here it is enough that the purposes urged on behalf of the law are serious and desirable, even if there are competing values which may be ranked higher on some constitutional scale. But the Constitution and the tra-

ditions of the nation establish that some limitations and qualifications may be placed on the voters' choice on election day. Democracy is a value, but so is good government. In this regard it is also relevant to point out that the law challenged here is not an administrative fiat, but it is part of the city charter democratically approved by the voters of Birmingham.

27. There is some safety in the incentive for opposing candidates to point out the candidate's shortcomings, but of course opposing candidates may not know much about a recently-arrived candidate.

jectives are achieved in every instance. The residency requirement may be overbroad, in that it excludes some newcomers who would be qualified and concerned candidates, but because it is limited to one year, the law is not unduly overbroad. Moreover, plaintiff has not suggested a less restrictive alternative which would be as practicable and as effective as the one year requirement—that is, plaintiff has not suggested another method which would simultaneously foster the three interests served by the present law, and which would not suffer from similar faults of over-or-underinclusiveness.

There are other considerations to be weighed. The residency law of course touches on important rights, since it singles out a "minority" of the citizenry—newly arrived residents—and temporarily restricts them from holding public office. But it is crucial to examine the real extent of the interference with these interests. Here there is no indication that recently-arrived residents are persecuted or abused in the city, so there is no reason to treat this classification with the vigilance usually reserved for "suspect" classifications, such as race. Nor is there any indication that newly arrived residents are unable to voice their opinions or unable to find candidates who can represent their views. And, as already discussed, the residency requirement does not curtail any protected rights in voting or political advocacy. Nor does the requirement actually impair the right to travel among the states to any appreciable degree; it is extremely unlikely that this law would inhibit anyone from moving to Birmingham.

Finally, the Court must also consider the great body of judicial precedent upholding one year residency requirements for candidates. These precedents, together with the universality of candidate residency requirements, testify to the contemporary societal judgment that a one year residency law is a suitable means to advance legitimate government objectives. The one year period may well be on the outer limits of constitutionality, but on balance the Court must conclude that the one year period is constitutional.

### C. Strict Scrutiny of the Challenged Law

Finally, it is arguable that the challenged charter provision may be found constitutional even if reviewed by the classical standards of strict scrutiny. After all, there is some "give" in the strict scrutiny test—

> "legal 'tests' do not have the precision of mathematical formulas. The key words emphasize a matter of degree . . ." Dunn v. Blumstein, 405 U.S. 330, 342–343, 92 S.Ct. 995, 1003, 31 L.Ed.2d 274 (1972).

In fact, several courts have used strict scrutiny in concluding that durational residency requirements for candidates were valid. The Ninth Circuit used the compelling state interest test to uphold a one year residency requirement for candidates for the Indian Tribal council. Howlett v. Salish and Kootenai Tribes, 529 F.2d 233 (9th Cir. 1976). The Colorado Supreme Court used strict scrutiny in upholding a one year requirement for municipal candidates, while striking a three year requirement. Cowan v. City of Aspen, 181 Colo. 343, 509 P.2d 1269 (1973). Accord, Draper v. Phelps, 351 F.Supp. 677 (Okl.1972) (six months for state representatives); Dunn v. Blumstein, 405 U.S. 330, 347, 92 S.Ct. 995, 1005, 31 L.Ed.2d 274 (1972) (upholding thirty-day residency period for voters on a strict scrutiny analysis).[28]

It is true that the cases for this Circuit have applied strict scrutiny in an extremely

---

**28.** The Third Circuit may also have taken the position that some candidate residency periods may be constitutional even under the strict scrutiny test. In Wellford v. Battaglia, 485 F.2d 1151 (3rd Cir. 1973) the Third Circuit concluded that strict scrutiny must be applied in this type of case. The Third Circuit there nullified a five year residency requirement for mayoral candidates. But interestingly the Court chose not to overrule Walker v. Yucht, 352 F.Supp. 85 (D.Del.1972), the case which upheld a three year requirement for state assemblymen (using a rational basis test). Instead, the Third Circuit distinguished Walker as involving a shorter period and a larger territorial unit of government. 485 F.2d at 1152 n. 2. This indicates that the Third Circuit considered the result in Walker to be correct, even under the Third Circuit's strict scrutiny analysis.

exacting manner, and the rhetoric of these cases has sometimes hinted that no durational residency requirement would be permissible. These cases are distinguishable, in the first place, because they dealt with residency periods greater than one year.[29] Moreover, the logic and language of these cases cannot be squared with the Supreme Court's ruling that a seven year requirement for state senators is constitutional. *Sununu v. Stark*, 420 U.S. 958, 95 S.Ct. 1346, 43 L.Ed.2d 435 (1975) *aff'g mem.* 383 F.Supp. 1287 (D.N.H.1974). To be sure, the Sixth Circuit in *Green v. McKeon*, as well as the other courts in this Circuit, did not have the benefit of this Supreme Court decision. It is now apparent that a seven year residency requirement is constitutional under certain circumstances, whatever the standard of review. Of course there are differences between the office of Birmingham city commissioner and that of New Hampshire state senator: But the Court cannot believe that these differences allow New Hampshire to require seven years residency, but preclude Birmingham from requiring one year. Thus on the authority of *Sununu v. Stark* this Court would have to uphold the charter provision even under the strict scrutiny test.

In conclusion, the Court places primary reliance on the great body of case authority upholding one year residency requirements for candidates, and on the Supreme Court's holdings that seven years is within constitutional limits for the office of governor and state senator in New Hampshire. The Court is troubled by the authority in this Circuit suggesting that under the regime of strict scrutiny, durational residency requirements for candidates may be unconstitutional *per se*. Yet these cases may be read narrowly, and distinguished on their facts. Moreover, subsequent developments in the law have eroded the theoretical foundations of the approach taken in this Circuit.

Finally it is obvious that the issues presented here are extremely difficult. It must not be forgotten that these issues come before the Court on a motion for a preliminary injunction. In that context,

the plaintiff must demonstrate a strong probability of success on the merits, an injunction will not issue in a doubtful case. *Detroit News Pub. Ass'n. v. Detroit Typo. Union No. 18*, 471 F.2d 872, 876 (6th Cir. 1972).

For all the foregoing reasons, plaintiff's motion is DENIED.

IT IS SO ORDERED.

---

**29.** The exception is the *Headlee* case, discussed *supra*.