John B. ANDERSON, et al.,
Plaintiffs-Appellees,

v.

Anthony J. CELEBREZZE, Jr., in his official capacity as Secretary of State of the State of Ohio, Defendant-Appellant.

No. 80–3513.

United States Court of Appeals,
Sixth Circuit.

Argued June 16, 1981.

Decided Nov. 4, 1981.

William J. Brown, Atty. Gen. of Ohio, Joel S. Taylor, Deputy Chief Counsel, Asst. Atty. Gen., Columbus, Ohio, for defendant-appellant.

James E. Pohlman, Porter, Wright, Morris & Arthur, Dixon Miller, Robert W. Trafford, Columbus, Ohio, Mitchell Rogovin/Vicki Jackson, George T. Frampton, Jr., Rogovin, Stern & Huge, Washington, D. C., Arthur Eisenberg, New York Civil Liberties Union, New York City, Bruce Campbell, ACLU of Ohio Foundation, Columbus, Ohio, for plaintiffs-appellees.

Before ENGEL, KENNEDY and MARTIN, Circuit Judges.

CORNELIA G. KENNEDY, Circuit Judge.

Ohio requires independent candidates for the Presidency to file a statement of candidacy with the Secretary of State some seven and one-half months before the general election in November. Partisan candidates for President are required to file at the same time in order to run in Ohio's preferential primary. Political parties are permitted to choose their presidential candidates as late as the middle of August. The

District Court for the Southern District of Ohio held that the early deadline for independents violates the first amendment and equal protection rights of appellees, an independent presidential candidate and his supporters.[1] The Secretary of State of the State of Ohio appeals. We find Ohio's laws to be within the limits set by the Constitution and reverse.

On June 8, 1979, Congressman John B. Anderson, Jr. of Illinois began his campaign to become the Republican Party candidate for the Presidency in the November, 1980 general election. Between June 9, 1979 and April 24, 1980, he raised over $7,700,000 and arranged to appear in 27 Republican primaries, actually appearing in nine. The results of these nine primaries showed that Anderson's attempt to become the Republican party nominee was doomed to failure. On April 24, 1980, Anderson announced that he would instead campaign as an independent. He requested those states in which he was still scheduled to appear in a Republican primary, including Ohio, to remove his name from the primary ballot, and began the formidable task of complying with the various state requirements for placing an independent candidate's name on the November general election ballot.

Ohio offers alternative routes to the general election ballot. Candidates who pursue the independent path are governed by Ohio Rev.Code § 3513.257, which requires that a statement of candidacy and nominating petitions bearing the signatures of 5,000 qualified voters be filed by the 75th day before the first Tuesday after the first Monday in June immediately preceding the general election. Thus, Congressman Anderson had to have filed no later than March 20, 1980 in order to appear on the November, 1980 general election ballot. Candidates who chose instead to vie for a political party's nomination for the Presidency by seeking delegates to the national convention in Ohio's June primary had to file, also by March 20, a declaration of candidacy and nominating petitions bearing signatures from 1,000 members of the candidate's party. Ohio Rev.Code § 3513.05.

Political parties must earn the right to field presidential candidates by complying with Ohio Rev.Code §§ 3513.01 et seq. and 3517.01 et seq. Parties that captured at least 5% of the vote in the last preceding gubernatorial or presidential election are automatically entitled to a spot on the general election ballot. New or small political parties are required to file 120 days before the primary election a statement of intent to participate in the June primary, plus nominating petitions signed by qualified electors equal to 1% of the number of electors who voted in the last gubernatorial or presidential election. Hence, a new party's nominating petitions had to bear approximately 28,000 valid signatures, 23,000 more than required for an independent candidate, and be filed by February 4, 45 days earlier than an independent candidate was required to file.

Ohio does not require that the person ultimately chosen as a political party's presidential nominee have participated in the state's June primary. Thus, while an independent must declare his candidacy by March 20, theoretically at least a partisan candidate need take no action and make no commitment until after his party's convention (or 75 days before the general election in the case of a minor political party—Ohio Rev.Code § 3505.01). As a result, the *official* deadline for a partisan candidate's announcement is approximately five months after an independent must declare his or her candidacy.

Anderson gathered approximately 16,000 signatures for his nominating petitions in Ohio between May 10 and May 15. He tendered the nominating petitions and a statement of candidacy to the Secretary of State's office on May 16, but appellant refused to accept them or to put Anderson's name on the ballot solely on the ground that the petitions and statement were not timely filed under section 3513.257.

Anderson brought this action on May 19, challenging the March 20 filing deadline for

---

1. The District Court's decision is reported at 499 F.Supp. 121.

independent candidates as a violation of the first and fourteenth amendments. Also named as plaintiffs were a registered voter in Ohio who wished to cast her vote for Anderson in the 1980 general election; a registered voter in New Jersey who feared that the value of his vote for Anderson in the general election would be diminished if Anderson were ineligible for Ohio's electoral votes; and an individual who desired to appear in the general election as an elector pledged to Anderson.

In a thoughtful opinion the District Court found that by excluding Anderson from the general election ballot Ohio's early filing deadline substantially burdened appellees' first amendment and fundamental rights by: (1) preventing Anderson from using his political campaign in Ohio as a means of disseminating ideas; (2) preventing Anderson and those who would vote for him from associating to advance their political beliefs by denying them the opportunity to vote for the candidate of their choice; (3) restricting the right to vote of those who would vote for Anderson in Ohio; (4) diluting the voting rights of Anderson voters in other states by denying their candidate access to the sixth largest pool of electoral votes in the country. The District Judge noted that the burden on constitutional rights was all the greater because of the large amount of support that Congressman Anderson enjoyed in Ohio and nationwide. The District Court also found that requiring independent candidates to declare their candidacy in March, but not mandating like action by partisan candidates until after their party's nominating convention, invidiously discriminated against independent candidates.

The District Court ruled that only a compelling interest could justify this burden on appellees' first and fourteenth amendment rights. Ohio argued that the deadline advanced its interest in political stability, by forcing potential independent candidates to disaffiliate themselves from political parties at an early date, thus preventing candidates from doing exactly what Anderson did here—beginning a power struggle within their party, then carrying that struggle on as independents once it became clear that they would not be successful within the party.

The District Court accepted the interest in political stability as compelling, and recognized that in the context of state elections the Supreme Court has approved disaffiliation requirements to accomplish this goal. *Storer v. Brown*, 415 U.S. 724, 94 S.Ct. 1274, 39 L.Ed.2d 714 (1974). However, the District Court held that the March 20 filing deadline acted as a disaffiliation provision only by happenstance, where an independent candidate who sought to file after March 20 had also sought a party nomination. The court noted that Ohio's law would keep off the ballot an independent candidate who filed after March 20 although he never associated with a political party. The court refused to accept the proposition that Ohio's interest in preserving the integrity of political parties through a disaffiliation provision is as great in a national election as in state elections.[2] The District Court also noted that another section of Ohio's election law addressed the same concern that Ohio claimed to be addressing through its early filing deadline. Ohio Rev.Code § 3513.04 contains a "sore loser" provision, which prohibits a candidate from seeking a place on the general election ballot as an independent if that person's name has appeared on the primary election ballot.[3] The District Court concluded that

---

**2.** Although the District Judge did not give his reasons, an explanation is found in *Anderson v. Babb*, 632 F.2d 300, 305–306 n.2 (4th Cir. 1980), a decision subsequent to the District Court's ruling. The Fourth Circuit observed that *Storer* recognized the state interest in using a disaffiliation provision to protect the integrity of a direct party primary in state elections that is *binding* on the state. Since a presidential preference primary is not binding on a national

political party's choice of a presidential candidate, the court reasoned that the same state interest in disaffiliation to prevent fraud and party raiding does not exist.

**3.** The parties agree that the sore loser provision did not bar Anderson's candidacy, apparently because his name did not appear on the primary ballot. We note also that section 3513.04

the filing deadline combined with the existing sore loser provision did not form a rational and narrowly drawn legislative scheme to promote political stability, and accordingly did not warrant the burdens imposed on or the discriminatory treatment of independents. *See also Greaves v. State Board of Elections of North Carolina*, 508 F.Supp. 78, 83 (E.D.N.C.1980) (where a state already has a "sore loser" statute, an early filing deadline for independent candidates cannot be considered necessary to accomplish the same goal). On July 17 the District Court granted appellees' motion for summary judgment and a preliminary injunction, ordering that Anderson's name be placed on the general election ballot.[4]

Congressman Anderson's late decision to run as an independent caused him to miss similar early filing deadlines in New Mexico, Maryland, Maine, and Kentucky.[5] In New Mexico, Maryland, and Maine Anderson raised challenges similar to those he raised in Ohio. He prevailed in all three states for substantially the reasons relied on by the District Court in this case. *See Anderson v. Morris*, 500 F.Supp. 1095 (D.Md.), *aff'd*, 636 F.2d 55 (4th Cir. 1980); *Anderson v. Hooper*, 498 F.Supp. 898 (D.N.M.1980); *Anderson v. Quinn*, 495 F.Supp. 730 (D.Me.1980), *aff'd*, 634 F.2d 616 (1st Cir. 1980).[6] *See also Greaves v. State Board,*

*supra*, 508 F.Supp. at 82–84 (no state interest justified a late April filing date for independents, but an early June deadline for new parties and a late summer deadline for established parties to pick their candidates); *McCarthy v. Kirkpatrick*, 420 F.Supp. 366, 373–375 (W.D.Mo.1976) (no state interest justified an early April filing date for independents and primary candidates, but a late summer deadline for partisan candidates who did not appear in the primary).

The general election was held during the pendency of this appeal. Anderson appeared on the ballot in all 50 states plus the District of Columbia, and received approximately 7% of the popular vote.

## Summary and Sub Silentio Supreme Court Precedent

Appellees make no claim that complying with the 5,000 voter signature requirement alone presents the least difficulty. Their position would be the same if Ohio required no nominating petition, but only a statement of candidacy, by March 20. Accordingly, we treat Ohio's law as if it were a simple filing deadline.

We are aware of no opinion of the Supreme Court that has ever directly considered the constitutionality of an early fil-

could be construed not to apply to presidential elections.

**4.** The Secretary of State filed a notice of appeal. On July 31, appellees moved this Court for an expedited appeal; appellant opposed the motion and it was denied. On August 7 appellant filed a petition for writ of certiorari in the United States Supreme Court, together with a motion to expedite consideration of the petition. On August 15, the Supreme Court denied the motion to expedite, and on September 18 the Court denied the petition for writ of certiorari.

The Supreme Court's denial of certiorari has no impact on our consideration of this case. A writ of certiorari to a court of appeals before that court has entered judgment will be granted only in a case of exceptional public importance. S.Ct.R. 18. Denial of appellant's motion for certiorari means only that appellant did not meet this difficult test.

**5.** The Kentucky case, *Anderson v. Mills*, 497 F.Supp. 283 (E.D.Ky.1980), *Rev'd in Part,*

664 F.2d 600 (6th Cir. 1981), was decided on the basis of state law.

**6.** The Maine filing deadline differed significantly from the Ohio deadline that we face in this case, in that it contained a statement of legislative purpose: "To Make Equal Application of Legal Requirements for Independents, Democrats, and Republicans in all Respects." 495 F.Supp. at 733, n.7. Party candidates for statewide office in Maine secure a place on the general election ballot by winning their party's primary, which they must enter by April 1. Thus, the Maine law treated independent and party candidates for statewide office alike. Although, unlike Ohio, Maine has no presidential primary, the statute contained no exception for independent presidential candidates. Thus the statute had the effect of treating partisan and independent presidential candidates differently, in contravention of the stated purpose of the statute.

ing deadline standing by itself. Notwithstanding this fact, we must determine whether the Court has held that a March 20 filing deadline is a constitutional impediment to exercise of the first amendment right to ballot access. Appellant contends that this is the effect of the summary affirmance of *Sweetenham v. Rhodes*, 318 F.Supp. 1262 (S.D.Ohio 1970), *aff'd sub nom. Sweetenham v. Gilligan*, 409 U.S. 942, 93 S.Ct. 282, 34 L.Ed.2d 214 (1972). The inquiry is actually broader than appellant suggests, as the Supreme Court has been asked in several cases to decide on direct appeal whether a filing deadline in March or earlier unconstitutionally burdens first amendment rights.

*Sweetenham* involved independent candidates for governor and Congress who sought declaratory and injunctive relief from Ohio's then early February filing deadline. The District Court denied relief on the equitable grounds that plaintiffs did not tender a nominating petition to state officials before the deadline or even before filing suit, and took no steps to become candidates before the May primary. *Pratt v. Begley*, 352 F.Supp. 328 (E.D.Ky.1970), summarily affirmed the same day as *Sweetenham*, 409 U.S. 943, 93 S.Ct. 282, 34 L.Ed.2d 214 (1972), presents similar facts. Kentucky's filing deadline was March 31, 1970. Like the plaintiffs in *Sweetenham*, plaintiff in *Pratt* sought equitable declaratory and injunctive relief placing him on the ballot as a candidate for Congress in Kentucky. Plaintiff was even a poorer candidate for equitable relief than were plaintiffs in *Sweetenham*, as he did not submit a nominating petition until the middle of August before the election. The District Court did not balance the equities, but denied relief on the ground that the filing deadline was reasonable and therefor constitutional. Plaintiffs in both cases appealed to the Supreme Court.

Appellant here notes that the statement of jurisdiction filed by the *Sweetenham* plaintiffs in the Supreme Court challenged the filing deadline itself as unnecessary to advance a compelling state interest and therefore a violation of the first and fourteenth amendments. Appellant cites *Mandel v. Bradley*, 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977): "Summary affirmances and dismissals for want of a substantial federal question without doubt reject the specific challenges presented in the statement of jurisdiction and do leave undisturbed the judgment appealed from." Appellant concludes that because the jurisdictional statement in *Sweetenham* raised first and fourteenth amendment challenges to a filing deadline even earlier than the one at issue here, appellees' first and fourteenth amendment claims in this case must also fail.

"Votes to affirm summarily, and to dismiss for want of a substantial federal question, it hardly needs comment, are votes on the merits of a case...." *Ohio ex rel. Eaton v. Price*, 360 U.S. 246, 247, 79 S.Ct. 978, 979, 3 L.Ed.2d 1200 (1959); *Hicks v. Miranda*, 422 U.S. 332, 344, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975). "[L]ower courts are bound by summary decisions by [the Supreme] Court ' "until such time as the Court informs (them) that (they) are not." ' " *Id.* at 344–345, 95 S.Ct. at 2289. However, the precedential effect of summary action is to be narrowly construed. "[S]ummary dispositions ... extend only to 'the precise issues presented and necessarily decided by those actions.'" *Metromedia, Inc. v. City of San Diego*, —— U.S. ——, ——, 101 S.Ct. 2882, 2888, 69 L.Ed.2d 800 (1981). "A summary disposition affirms only the judgment of the court below ... and no more may be read into [the Supreme Court's] action than was essential to sustain that judgment." *Illinois State Board of Elections v. Socialist Workers Party*, 440 U.S. 173, 182–183, 99 S.Ct. 983, 989, 59 L.Ed.2d 230 (1979).

In light of the narrow effect to be given summary dispositions, appellant has construed the quoted sentence from *Mandel* too literally. The Supreme Court was not holding that a summary affirmance decides every issue raised in the jurisdictional statement, but that on the narrow facts before the Court the issues raised in the jurisdictional statement did not warrant the relief

sought. To hold otherwise would permit parties appealing cases to the Supreme Court to control the precedential effect of a summary action by the way they structure their jurisdictional statement.

Nonetheless, appellant's conclusion is correct. Had the Supreme Court affirmed *Pratt* and *Sweetenham* before the November 1970 elections, the precedential effect of its action would pretty clearly be limited to a determination that equity did not demand that plaintiffs in those cases have a place on the ballot in view of their late filing. However, the Supreme Court did not affirm until almost two years after the 1970 elections. At that time, any claim for equitable relief and any decision based on the equities asserted by these parties was long since mooted. Therefore, the only purpose we can find to the Court's action in 1972 was to settle the constitutionality of Ohio's and Kentucky's filing deadlines for future elections.[7]

It might also be argued that *Mandel v. Bradley, supra,* decided the constitutionality of a March deadline against all first amendment challenges sub silentio. The plaintiff in *Bradley v. Mandel,* 449 F.Supp. 983 (D.Md.1976), desired to be a candidate in a Maryland congressional election but failed to submit signatures from 3% of the qualified voters by the March 8 deadline. The District Court interpreted *Tucker v. Salera,* 424 U.S. 959, 96 S.Ct. 1451, 47 L.Ed.2d 727 (1976), summarily affirming 399 F.Supp. 1258 (E.D.Pa.1975), as holding that it was an unconstitutional burden to have to submit *any* signatures at such an early date. The Supreme Court held that the District Court had misconstrued the effect of *Tucker; Tucker* had not held that it is unconstitutionally burdensome to require candidates to meet *any* March signature requirement, but just the particular signature requirement Pennsylvania imposed in *Tucker.* Pennsylvania required candidates to collect signatures totalling 2% of qualified voters within a three week period ending in March. The Court vacated and remanded with directions to ascertain the difficulty a "reasonably diligent independent candidate" would face in satisfying the requirement.

As a matter of strict logic, there was no reason to remand *Mandel* to determine the difficulty of collecting signatures by March 8 if it were unconstitutional even to require a person to decide whether to run by that date. However, no party argued this position to the Supreme Court or the District Court in *Mandel.* The District Court's opinion, the jurisdictional statement filed by appellants, the briefs for both parties, and *Tucker,* the case relied on by the District Court, all address only the burdens of collecting signatures by an early date, e. g., harsh weather, uninterested voters, and discouraged volunteers. These burdens have little to do with the difficulty of deciding whether to run in March. In fact, plaintiff in *Mandel* had made that decision almost a

---

7. Two additional summary actions by the Supreme Court merit discussion. The jurisdictional statement in *Auerbach v. Mandel,* 409 U.S. 808, 93 S.Ct. 55, 34 L.Ed.2d 69 *aff'g* Civ.No. 72–141–N (D.Md.1972), squarely raised the constitutionality of a March 6 filing deadline. But, although the District Court stated in its oral opinion in *Auerbach* that it thought a March 6 deadline reasonable, it clearly did not deny relief on that basis. In addition, the motion to affirm filed in the Supreme Court asserted that the constitutionality of the filing deadline was not properly raised. This uncertain state of affairs precludes us from relying on *Auerbach* to reverse the District Court here.

The Supreme Court dismissed for want of a substantial federal question the appeal in *Ring v. Marsh,* 78 F.Supp. 914 (D.N.J.), *appeal dismissed,* 335 U.S. 849, 69 S.Ct. 84, 93 L.Ed. 398 (1948). Plaintiff sought injunctive relief placing him on the ballot in New Jersey's congressional election, though he missed the March 11 filing deadline and did not attempt to file a nominating petition with the state until May 22, more than a month after the primary election. The District Court denied relief on the ground that the filing deadline itself was reasonable.

We are unable to distinguish the facts of *Ring* and this case in a meaningful way. However, plaintiff's jurisdictional statement in *Ring* was almost incoherent, and seems only to have argued that the District Court erred by deciding whether plaintiff was entitled to a permanent injunction when all he sought was a preliminary injunction. Therefore, we are reluctant to treat the Supreme Court's dismissal as dispositive here.

year earlier. Thus, we cannot say the burden of deciding whether to run by March was actually before the Supreme Court, or that *Mandel* disposes of Anderson's challenge to Ohio's filing deadline.

We conclude that the Supreme Court's disposition of *Pratt* and *Sweetenham* answers appellees' first amendment challenge to Ohio's filing deadline. *Mandel v. Bradley* and *Ring v. Marsh, supra,* n.7, lend support to this conclusion. However, in view of the limited precedential effect to be accorded summary dispositions and our uncertainty over just what the impetus for the Court's decision was in those cases, we regard this as rather a slender reed on which to rest our decision. Thus, we undertake to supply an alternative ground for denying the claim that the filing deadline is too early under the first amendment.

## Historical Overview

"Ballot access statutes are not susceptible of easy analysis, nor is the appropriate standard of review always easy to discern." *McLain v. Meier,* 637 F.2d 1159, 1163 (8th Cir. 1980). Analysis must begin with the text of the Constitution, which governs presidential elections in Article II, Section 1, Clause 2:

> Each State shall appoint, in such manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.

**8.** *See also Oregon v. Mitchell,* 400 U.S. 112, 122, 91 S.Ct. 260, 263, 27 L.Ed.2d 272 (1970) (opinion of Black, J.), quoting from *Smiley v. Holm,* 285 U.S. 355, 366–367, 52 S.Ct. 397, 399, 76 L.Ed. 795 (1932):

> "It cannot be doubted that these comprehensive words [the grant to the states in Article I, Section 4 to control the time, place, and manner of holding congressional elections] *embrace authority to provide a complete code for congressional elections,* not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the

The Supreme Court observed in *McPherson v. Blacker,* 146 U.S. 1, 27, 13 S.Ct. 3, 7, 36 L.Ed. 869 (1892): .

> [T]he word "appoint" . . . was manifestly used as conveying the broadest power of determination.

The Court went on to say:

> [T]he appointment and mode of appointment of electors belong exclusively to the states under the Constitution of the United States. . . . Congress is empowered to determine the time of choosing the electors and the day on which they are to give their votes, which is required to be the same day throughout the United States, but otherwise the power and jurisdiction of the State is exclusive, with the exception of the provisions as to the number of electors and the ineligibility of certain persons, so framed that congressional and Federal influence might be excluded.

*Id.* at 35–36, 13 S.Ct. at 10–11.[8] The only limitation on the states' power to appoint presidential electors is that the power may not be exercised in a way that violates other express provisions of the Constitution. *Williams v. Rhodes,* 393 U.S. 23, 29, 89 S.Ct. 5, 9, 21 L.Ed.2d 24 (1968).

With the power to appoint presidential electors came corresponding state responsibility for elections. Laws restricting access to the ballot are the result of state efforts to discharge this responsibility.[9]

The first modern Supreme Court case to consider the constitutionality of state ballot

> numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved. . . ."

We perceive no reason not to accord the word "manner" in Article II the same broad construction.

**9.** Ballot access was not a problem until the latter part of the nineteenth century, since until that time every political party produced its own ballot. Blackman, Third Party President? 2 (1976). This system engendered fraud, in turn prompting the states to adopt reforms, among which was the importation of the Australian, or secret ballot. *Id.* State control over the ballot created the need for rules to govern access.

access laws was *Williams v. Rhodes, supra,* which dealt with an earlier and extremely burdensome version of Ohio's election laws. Those laws contained no provision for independent or write-in candidates, and they required new political parties to file, not later than February 7 of the election year, a nominating petition signed by electors totalling 15% of the number of votes cast in the preceding gubernatorial election. Any party that managed to satisfy the signature requirement (none did) would also have had to follow complex and burdensome organizational procedures. The Court later characterized these laws as making it "virtually impossible" for a new party to get on the ballot. *Jenness v. Fortson,* 403 U.S. 431, 434–435, 91 S.Ct. 1970, 1972, 29 L.Ed.2d 554 (1971). The Court held that only a compelling interest could justify such substantial burdens on "two of our most precious freedoms"—the right to associate for the advancement of political beliefs and the right of voters to vote effectively—falling so unequally on the members of new and small political parties. *Williams v. Rhodes,* 393 U.S. at 31, 89 S.Ct. at 10. Rejected as not sufficiently compelling were Ohio's interests in the political stability that a two-party political system provides, and in ensuring that the winner of an election is in fact supported by the majority of voters, an interest that Ohio advanced by restricting the voters to a choice between the two major political parties. *Id.* at 31–32, 89 S.Ct. at 10–11.

*Williams* preceded a number of Supreme Court ballot access cases, in addition to the summary actions discussed above in which the Court let stand every lower court decision that upheld a March filing deadline. In a full opinion the Court upheld a California "disaffiliation provision" for state elections, which prohibited a candidate who failed to disaffiliate from a political party some twelve months before a primary election from running as an independent in the following general election. The Court rested its conclusion on the ground that the law furthered the state's interest in political stability by preventing one party from fielding a candidate to bleed votes from another party. *Storer v. Brown, supra; See also Rosario v. Rockefeller,* 410 U.S. 752, 93 S.Ct. 1245, 36 L.Ed.2d 1 (1973) (upholding a provision that to vote in a party primary, voters had to affiliate with that party at least eleven months before the primary). But, it has struck down a 23-month disaffiliation requirement that effectively tied voters to a given party. *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973).

The Court upheld a Georgia requirement that to obtain ballot position new political parties had to file a petition containing the signatures of 5% of eligible voters, plus pay a filing fee equal to 5% of the salary for the office sought. *Jenness v. Fortson, supra.* The Court noted the state's "important" interest in requiring candidates to make a preliminary showing of support, 403 U.S. at 442, 91 S.Ct. at 1976. The Court distinguished *Williams* by noting that the *totality* of the Ohio scheme, which in effect kept all new parties off the ballot, rendered that scheme invalid; by contrast, Georgia did not have an unreasonably early filing deadline (the second Wednesday in June, as opposed to February 7),[10] did not require an unreasonably large number of signatures, and did not impose burdensome organizational requirements on those parties that did satisfy its signature requirements.

In other decisions the Supreme Court has twice remanded challenges to signature requirements for consideration of whether a "reasonably diligent candidate" could meet them; once in the context of a presidential election, *Storer v. Brown, supra* and once in the context of a senatorial race. *Mandel v. Bradley, supra.* It struck down, as unnecessary to ensure that a candidate is serious, large filing fees in state and local elections.

10. Although the Supreme Court in *Jenness* characterized Ohio's February 7 filing deadline as "unreasonably early," that characterization was in conjunction with the difficulty of satisfying a 15% signature requirement by February 7, and is not controlling here. We note also that March 20 is over 40 days closer to the general election than February 7. The Court did not consider the validity of an early deadline to further the interests we find here.

*Lubin v. Panish*, 415 U.S. 709, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); *Bullock v. Carter*, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972). Finally, the Court invalidated an Illinois requirement that nominating petitions for elections in Chicago bear signatures of 5% of the qualified voters, significantly more than 25,000, while only 25,000 signatures were required for statewide elections. *Illinois State Board of Elections, supra.*

### Standard of Review

It appears that after the District Court found that the March 20 filing deadline substantially burdened appellees' constitutional rights, it put the burden on Ohio to demonstrate that the filing deadline was necessary to advance a compelling interest. Appellant argues that this was error, that under *Mandel* and *Bradley* Ohio's filing deadline is constitutional if a "reasonably diligent independent candidate" could comply with the relatively modest 5,000 signature requirement by March 20. Appellant notes that several independent candidates did qualify for places on the Ohio ballot in 1980. Thus, appellant concludes that a reasonably diligent candidate could satisfy the requirement, which therefore passes constitutional muster.

We agree with the District Court that appellant has misperceived the relevance of what a "reasonably diligent candidate" is able to do. In both *Mandel* and *Storer* plaintiffs had challenged the signature requirement itself as unconstitutionally burdensome. Prior to both cases, it was already established that the interest served by a signature requirement, guaranteeing that candidates appearing on the ballot enjoy a modicum of community support, was important. *Jenness v. Fortson*, 403 U.S. at 442, 91 S.Ct. at 1976. Thus, the Court's remand in *Mandel* and *Bradley* with directions to determine whether a reasonably diligent candidate could satisfy the signature requirement indicates that, accepting the state's interest as important, the means chosen to effectuate that interest nonetheless may not be too burdensome.

The reasonably diligent candidate test is peculiarly well-suited to weighing the burden imposed by collecting signatures before a given date or within a given time. The test is of limited usefulness in assessing burdens other than the difficulty of collecting signatures. It is no help in assessing the importance of Ohio's interests in the filing deadline itself, interests which are different than those furthered by a signature requirement. The hardships of a filing deadline, standing alone, are not those of persuading eligible voters to sign one's nominating petition. Rather, a candidate is required to make up his mind at an early date whether to participate at all in an election several months hence, before the issues are crystallized, the competition identified and support can be estimated. We agree with the District Court that a candidate's "diligence" has little to do with the severity of this burden.

■ Nonetheless, appellant is correct that the District Court required Ohio to prove too much. Under the Constitution and the Supreme Court's ballot access cases it is the courts' duty to discern whether a justification can be found for the law in question. *See Storer v. Brown, supra,* 415 U.S. at 746, 94 S.Ct. at 1286 (the Supreme Court could not "discern" or "perceive" sufficient state interests to justify the law in question). The state interests furthered must be balanced against the concomitant burden on access to the ballot. If the state law has the effect of granting a monopoly to the existing major political parties, then of course only a compelling interest will satisfy the Constitution. *Williams v. Rhodes, supra,* 393 U.S. at 31, 89 S.Ct. at 10. Lesser burdens can be justified by lesser interests. *See Storer v. Brown,* 415 U.S. at 743, 94 S.Ct. at 1285 (only if a state requires a large number of signatures does a court ask whether it has a compelling interest in having candidates collect the signatures within a short time). There is no "litmus-paper test" to separate valid from invalid ballot access laws. "Decision in this context ... is very much 'a matter of degree'...." *Id.* at 730, 94 S.Ct. at 1279. "[N]ot every limitation or incidental burden

on the exercise of voting rights is subject to a stringent standard of review. . . . In approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters." *Bullock v. Carter, supra*, 405 U.S. at 143, 92 S.Ct. at 856.

We note that in *Illinois State Board of Elections, supra*, the Supreme Court's most recent decision in the realm of ballot access laws, the Court placed the burden on Illinois to establish that it was necessary to advance a compelling interest to require candidates to collect more signatures in order to appear on the ballot in City of Chicago elections than to appear in statewide elections. Further, we recognize that some of the Court's language in *Illinois Board* seems to require states to show that *all* ballot access restrictions are necessary to further a compelling interest: "When such vital individual rights are at stake, a State must establish that its classification is necessary to serve a compelling interest". 440 U.S. at 184, 99 S.Ct. at 990. However, we do not think that this language can be divorced from the peculiar facts of the case before the Court—Illinois itself indicated that the signature requirement for Chicago elections was unnecessarily restrictive by requiring a lesser demonstration of support from candidates in statewide elections in which a greater number of voters participated.

Literally applied, the language of *Illinois Board* would require a state to justify by a compelling interest every departure from the least restrictive ballot access law in the nation. Not only is this inconsistent with the broad power the Constitution grants to the states to choose presidential electors, a power that creates a presumption in favor of the state regulation, it is inconsistent with Supreme Court opinions that approve varying signature and disaffiliation requirements.[11] The 5% signature requirement in *Jenness* was very significantly higher than that of most states. As the Court noted in

*Williams v. Rhodes*, 393 U.S. at 33 n. 9, 89 S.Ct. at 11 n.9, as of 1968, 42 states had a signature requirement of 1% or less. Georgia's interest in the signature requirement was described in *Jenness* as "important," not compelling, 403 U.S. at 442, 91 S.Ct. at 1976, and the 5% requirement was upheld although Georgia made no attempt to demonstrate that it was "necessary" to have a much stiffer signature requirement than sufficed in other states. Yet, the opinion in *Illinois Board* not only did not explicitly overrule *Jenness*, it cited *Jenness* with approval. 440 U.S. at 185, 99 S.Ct. at 990. Similarly, if the states always bear the burden of showing that their laws are the least restrictive means to their ends, there should have been no remand to weigh the burden of the signature requirements in *Mandel, supra*, and *Storer, supra*, which were also cited with approval in *Illinois Board*, 440 U.S. at 182, 184, 99 S.Ct. at 989, 990.

**Filing Deadline**

█ The above authorities considered together persuade us that Ohio's March 20 filing deadline does not violate either the first amendment or the equal protection clause of the fourteenth amendment. Ohio's early deadline ensures that voters making the important choice of their next president have the opportunity for a careful look at the candidates, a chance to see how they withstand the close scrutiny of a political campaign.

The importance of this interest was made clear at the Constitutional Convention in 1787, where the delegates debated extensively the means of selecting the President. The alternatives that received the most attention in the early debates were appointment by the national legislature and election by the people at large. The former would have made it impossible to guarantee an independent executive. Election by the people was also disfavored, in part because of concern over the ignorance of the populace as to who would be qualified for the

---

11. A good discussion of the difficulties and inconsistencies that result when reliance on conclusory language such as "strict scrutiny" or "compelling interest" is substituted for the

hard judgments that courts are called upon to make when constitutional rights are in issue appears in *Joseph v. City of Birmingham*, 510 F.Supp. 1319 (E.D.Mich.1981) (Pratt, J.).

job. Other proposals included selection of the President by state executives; selection by electors chosen by electors chosen by the people (Hamilton's suggestion); selection by electors chosen by the state legislatures. *See generally* Prescott, Drafting the Federal Constitution 564–624 (1941).

The present Article II, Section 1, Clause 2 is the resulting compromise. "The [Electoral] College was created to permit the most knowledgeable members of the community to choose the executive of a nation whose continental dimensions were thought to preclude an informed choice by the citizenry at large." *Williams v. Rhodes,* 393 U.S. at 43–44, 89 S.Ct. at 16–17 (Harlan, J., concurring) (footnote omitted). At the same time, it was thought that the College would be incapable of exercising any continuing influence over the person selected.

The responsibility for ensuring careful selection of the President passed to the states with the adoption of Article II, Section 1. The need for careful selection has not diminished over the years.

> In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation.

*Buckley v. Valeo,* 424 U.S. 1, 14–15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976).

"The importance of [the President's] election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated." *Burroughs v. United States,* 290 U.S. 534, 545, 54 S.Ct. 287, 290, 78 L.Ed. 484 (1934). When the states delegated the selection of electors to the people at large, the concerns voiced at the Constitutional Convention about the public's ability to vote intelligently became the states' concerns.[12]

To be sure, some of the impediments to an informed electorate that existed in 1787 have been removed by our extensive present day communications network, through which news of a candidacy is transmitted nationwide virtually simultaneously with its announcement. However, rapid communication can only inform the electorate of the existence of a candidacy. Equally crucial to a meaningful vote is the electorate's ability to evaluate those who would be President once aware of their desire to fill the post. Ohio may very reasonably conclude that requiring presidential candidates to be in the public eye for a significant time materially advances its interest in careful selection. *See Pratt v. Begley, supra,* 352 F.Supp. at 330. We also find *CBS, Inc. v. Federal Communications Commission,* —— U.S. ——, 101 S.Ct. 2813, 69 L.Ed.2d 706 (1981), holding that the FCC could require broadcasters to provide equal access to political parties eleven months before the general election, indicative of an interest in giving voters information at an early date. Ohio has advanced this interest to the extent that it can within the party system by requiring independent and substantially all partisan candidates to file by March 20.

Ohio has a related interest that is furthered by the March 20 filing deadline. In an election year a voter must decide whether to lend financial support or volunteer effort to a candidate (and if so, to whom) and whom to vote for in the primary. Ohio has an interest in helping its voters make informed choices about where to allocate their support. The March 20 filing deadline for independent candidates and those partisan candidates who appear in the primary, coupled with the February 4 filing deadline for political parties, informs the voters by a date certain of most of their options, with the possible exception of partisan candidates who do not appear in Ohio's primary but nonetheless seek their party's nomina-

---

**12.** In fact, the first ballot access restrictions were enacted in the beginning of this century to foster rational voting by uncluttering the ballot. Elder, "Access to the Ballot by Political Candidates," 83 Dickinson L.Rev. 387, 389–390 (1979). Cluttered ballots are no longer a problem, *Williams v. Rhodes,* 393 U.S. at 33, 89 S.Ct. at 11, but the state interest in fostering intelligent voting remains.

tion. *But see Salera v. Tucker, supra,* 399 F.Supp. at 1267–1268 (the state interest in informing the electorate who the independent candidates are does not justify an early filing deadline, especially since it cannot be known at that point who the major party candidates will be).

It is not enough, however, to say that Ohio has interests in ensuring that its voters make a well-considered choice for President. Ohio's law must rationally further those interests, and they must be strong enough to justify the burden imposed by a deadline some seven and one-half months before the general election. Deciding how much time the voters need to examine presidential candidates necessarily involves difficult problems of line drawing. That fact and the extent of the power the Constitution grants to the states to choose presidential electors counsel us to give a good deal of deference to the date that Ohio has selected.[13]

Moreover, we do not think the burden of meeting Ohio's filing deadline is as great as the District Court described it. The District Judge examined only the burden on Anderson and his supporters, a burden which was certainly large, for Anderson missed the deadline. While the impact of ballot access laws on Anderson himself is a factor, the underlying rationale of the "reasonably diligent candidate" test of *Mandel v. Bradley, supra,* and *Storer v. Brown, supra,* is that the burden of ballot access laws is not assessed solely from the perspective of the excluded candidate. *Cf. Williams v. Rhodes,* 393 U.S. at 34, 89 S.Ct. at 12: "[T]he number of voters in favor of a party, along with other circumstances, is

relevant in considering whether state laws violate the Equal Protection Clause."

Recognizing that an early filing deadline requires a candidate to decide whether to run before the issues have crystallized and before he can know the extent of his support, we do not think that the impact on the class of independent candidates of having to decide by March 20 whether to seek the Presidency is very large.[14] *Cf. Storer v. Brown,* 415 U.S. at 734, 94 S.Ct. at 1281 (the state interest in preserving the integrity of state elections justified requiring independent candidates to anticipate their candidacy a full year before the *primary* election). It is little enough to ask of a person seeking one of the most powerful and influential posts on earth that he make up his mind whether to run seven and one-half months before the election. In point of fact, most serious candidates will have made a decision by that time, and to that extent a state requirement that the decision be made by March 20 is even less of a burden.[15] Viewed in that light, the March 20 filing deadline would for the most part screen out candidates in Anderson's position—those who decided to run, but did not decide early enough what form their candidacy should take. The Constitution does not require Ohio to alleviate the difficulty of choosing among alternate routes to the ballot.

The next question is whether, although Ohio's laws further important state interests, they are irrational means to those ends because they do not exclude from the general election ballot partisan candidates chosen at their party's convention who did not run in the primary. This question is closely

13. We also note that the effect of limiting the states' discretion would be to require uniformity, thus compressing the signature gathering and campaigning requirements in the various states. This would greatly increase the burden on all candidates, who may presently devote their scarce resources to a few states at a time.

14. In this regard, we note that no less than five independent candidates were apparently able to satisfy Ohio's criteria and appear on the presidential ballot in the 1980 election. It further appears that the number of independent candidates in Ohio in 1980 was not unusual.

15. The District Court in this case, as well as the District Court in *Anderson v. Morris, supra,* 500 F.Supp. at 1098, discounted the relevance of the fact that most candidates make a decision before March 20. However, a statutory classification "is not to be upset upon hypothetical and unreal possibilities, if it would be good upon the facts as they are." *Pullman Co. v. Knott,* 235 U.S. 23, 26, 35 S.Ct. 2, 3, 59 L.Ed. 105 (1914).

intertwined with appellees' equal protection claim, that by not also formally excluding all partisan candidates who do not file by March 20, Ohio's election laws invidiously discriminate against independent candidates for the presidency.[16]

Before we can determine that a state's laws irrationally and invidiously discriminate between classes, it is necessary to determine whether or not the classes are alike in the relevant respects. The comparison between independent candidates and either political parties or political party candidates is a particularly difficult one. As the District Court noted, independent candidates are obviously not the same as either political parties or partisan candidates. It is much harder to move beyond the obvious and to come to grips with the ways in which independent candidates are like and unlike political parties and their candidates, and how these likenesses and differences are relevant to this case.

The District Court ruled that for the purposes of Ohio's filing deadline independent candidates were very similar to partisan candidates, in that to a great extent the

success of both depends upon the appeal of the individual, independent of support from any party structure. Accordingly, the court held that the two classes could not be treated so differently in terms of a filing deadline as Ohio treats them here. It is true that the success of an independent candidate depends on his appeal as an individual. Personal appeal is all he has to offer. However, the same cannot be said of a partisan candidate. While the success of the Republican candidate vis-a-vis the Democratic candidate may depend to a significant extent on the personal appeal of each, that is only because in large part the efforts of the competing party structures balance each other out. The contest between the Republican candidate, for example, and the various third party and independent candidates *is* determined largely by party structure, not individual appeal. A party candidate's success is an amalgam of individual appeal and the party's appeal. Thus, independent and partisan candidates are not so similar as the District Court believed.

Further, there are differences between independents and partisans that are rele-

---

**16.** It is suggested that the Supreme Court's failure to adopt Justice Stevens' dissent in *Mandel v. Bradley, supra,* disposes of appellees' equal protection claim. We do not think so. The District Court in *Mandel* was faced with a Maryland law that required independent candidates for statewide office to file a nominating petition containing the signatures of 3% of the qualified voters 230 days before the general election. Plaintiff in that case challenged the law *inter alia* as a violation of equal protection, in that a partisan candidate was not required to take any action other than to file a statement of candidacy 230 days before the general election, while an independent candidate had to have a nominating petition containing 51,155 signatures filed by that date. In order to comply with the signature requirement, plaintiff charged, an independent candidate was required to gear up his political machinery far in advance of the filing date, and was thus required to decide whether to run well before a partisan candidate was. The District Court did not decide the case on this basis. Rather, it considered itself bound to find the early filing deadline unconstitutional by the Supreme Court's summary affirmance in *Tucker v. Salera, supra.*

The Supreme Court remanded with instructions to assess the burden of complying with the filing deadline on the ground that the case

was not controlled by *Salera.* The Court never discussed the equal protection issue, but Justice Stevens dissented on the basis of plaintiff's equal protection argument.

We do not construe the Supreme Court's action in *Mandel* as a rejection of the equal protection argument that appellees make here. The Court did not clearly reject the equal protection claim. It would be necessary to assess the burden of complying with the filing deadline as per the Court's instructions to decide the equal protection claim raised by plaintiff in *Mandel,* since plaintiff argued that this burden caused an invidious discrimination. More importantly, the equal protection argument raised in *Mandel* is different than the one made by appellees here. Appellees do not claim that they were denied equal protection because complying with Ohio's 5000 signature requirement forced them to make a decision earlier than any partisan candidate. They claim that they were discriminated against because although independent candidates had to decide whether to run at the same time as partisan candidates who wished to appear in Ohio's primary, Ohio did not require partisan candidates to appear in the primary, and thus did not require them to decide whether to run by March 20.

vant to the rationality of Ohio's classification. While laws restricting the right of independents to appear on the ballot affect only independents, laws restricting access for partisan candidates affect not only the candidates but also the parties. Political parties have an existence separate from any individual they may sponsor as presidential candidates. The party has an interest of its own in being free to select the best candidate it can find to advance its views. *See Cousins v. Wigoda,* 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975) (Illinois could not force the Democratic Party to seat delegates at its national convention): "The Convention serves the pervasive national interest in the selection of candidates for national office, and this national interest is greater than any interest of an individual State." *Id.* at 490, 95 S.Ct. at 549. *See also Democratic Party v. La Follette,* 450 U.S. 107, 101 S.Ct. 1010, 67 L.Ed.2d 82 (1981) (a state which conducts an open primary cannot protect the primary results by requiring state delegates to the party convention to vote in accordance with those results): "[A political party] has a substantial interest in the manner in which the delegates to its National Convention are selected." *Id.* at 126, 101 S.Ct. at 1021.

By earning for themselves a place on the ballot prior to February 4, political parties in Ohio earned the right to name persons at a later date to occupy that place. Properly understood, the provision that partisan candidates may run in the general election without running in the primary does not create a right for partisan candidates at all. It is a right of political parties, with rather an incidental effect on partisan candidates. If this flexibility affords political parties some advantage over independent candidates, the advantage is counterbalanced by the more stringent qualification requirements parties must meet. By contrast, the independent's candidacy has no existence apart from that of the candidate, and no interest in flexibility in choosing its nominee. While the independent candidate has the same interest as the partisan candidate in being able to make a late decision, he has no interest or right comparable to that of the political party.

Further, all that the voters know about an independent candidate comes from their knowledge of him as an individual. The same is not true of partisan candidates. In broad outline, a voter knows a significant amount about, for example, the Communist, the Libertarian, or the Democratic party candidates if he knows about the parties they will represent. If Ohio's goal is an informed electorate, this difference between independents and parties justifies some difference as to when each type of candidate must announce his bid for office.

Ohio's election laws reflect these differences in a permissible manner. Independent candidates need not satisfy the stricter filing requirements applicable to political parties. On the other hand, they must file much earlier than a partisan candidate who does not run in Ohio's primary, a reflection of the facts that the vast majority of partisan candidates file at the same time; that the voters have less a priori knowledge about independents than about partisan candidates; and that political parties have a legitimate interest in not having to announce all of their potential candidates at an early date, an interest which does not exist with independent candidates.

Thus, we find that Ohio's laws do not impermissibly discriminate against independent candidates, and are designed rationally to further sufficiently important state goals, even when we examine the filing deadline standing apart from the remainder of Ohio's election laws. Assuming that there *is* some discrimination in this one aspect of Ohio's election laws, we are still not persuaded that the March 20 filing deadline plus the 5,000 signature requirement make an independent candidate's route to the ballot more burdensome than is the route that must be followed by a partisan candidate. *Cf. Jenness v. Fortson, supra,* 403 U.S. at 438–441, 91 S.Ct. at 1974–1975. If anything, compliance with Ohio's requirements for independent candidates is easier than winning a political party's nomination.

Accordingly, the judgment of the District Court is reversed.